Barbara DIESS & Stewart Diess, Individually and as husband and wife, And Shawn Diess, And Rhonda Jarvis & John Jarvis, Individually and as husband And wife, and John Jarvis, Jr. And William Debevec And Robyn Lenhart & Tim Lenhart, Individually and as husband and wife and as parents and natural guardians of Tyler Lenhart, a minor, Brittany Lenhart, a minor, and Alicia Lenhart, a minor, And Amanda Lenhart And Jamie Wilson & Richard Wilson, Individually and as husband and wife, And Billie Arca & Andy Arca, Individually and as husband and wife, And Adora Kelly And Andrew Kelly And Bryan Drew Kelly And Brian Kohut Individually and as husband to Plaintiff, Denise Kohut, and as parent and natural guardian of Terry Kohut, a minor, and Ashley Kohut, a minor, and Jeramy Kohut, a minor, And Denise Kohut, Individually and as wife to Plaintiff Brian Kohut, and as guardian of Terry Kohut, a minor, Ashley Kohut, a minor, and

Jeramy Kohut, a minor, And Gloria Toth & George Toth, Individually and as husband and wife, And Kathy Havel, Guardian of Jonathan Havel, a minor, And Kelsey Havel, a minor, And William Myers, Petitioners

v.

PENNSYLVANIA DEPARTMENT OF TRANSPORTATION And Municipal Authority of Westmoreland County And Pennsylvania Department of Environmental Protection And Weavertown Environmental Group, Inc. a/k/a Weavertown Environmental Group And Allegheny Energy a/k/a Allegheny Energy (AYE), Respondents.

Commonwealth Court of Pennsylvania.

Argued May 8, 2007.

Decided Sept. 13, 2007.

Reargument Denied Nov. 19, 2007.

Deanna Kaplan Tanner, Conshohocken, for petitioners.

Tracey A. Wilson, Pittsburgh, for respondents, Pennsylvania Department of Transportation and Pennsylvania Department of Environmental Protection.

Michael E. DeMatt, Greensburg, for respondent, Municipal Authority of Westmoreland County.

Alan S. Miller, Pittsburgh, for respondent, Weavertown Environmental Group, Inc.

C. Shawn Dryer, Pittsburgh, for respondent, Allegheny Energy (AYE).

BEFORE: COLINS, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge.

OPINION BY Judge COLINS.

The above-named Petitioners (Landowners) filed a Complaint with the Court of Common Pleas of Allegheny County seeking equitable relief and damages against the Respondents [1] based upon incidents involving the release of a substance called

---

1. The named Respondents are: the Pennsylvania Department of Environmental Protection, the Pennsylvania Department of Transportation, Weavertown Environmental Group, Inc., the Municipal Authority of Westmoreland County, and Allegheny Energy.

"fly ash"[2] into the Landowners' neighboring environment. The trial court, after reviewing the Complaint, in apparent recognition of the Commonwealth Respondents, and the largely equitable nature of the relief the Landowners seek, transferred the Complaint to this Court. All five named Respondents filed preliminary objections to the Complaint, which the Court will now consider. The Complaint alleges the following pertinent facts.

The Landowners, with two exceptions, own land and live on either Rostosky Ridge Road or Rainbow Run Road in Forward Township in Allegheny County.[3] The Complaint alleges that Respondent Allegheny Energy generated the fly ash at Mitchell Power Plant at an indeterminate date. Allegheny Energy entered into a contract with Fiori Contracting Company (which Landowners have not named as a Respondent) to remove fly ash and "bottom ash" from Mitchell Power Plant and dispose of the ash at River Hill Road in Forward Township to be used by the Department of Transportation for the maintenance of River Hill Road, and specifically to be used as structural material for construction of the roadway, its embankment, and adjacent slope.

The Municipal Authority of Westmoreland County maintains a water main that lies under River Hill Road. On January 25, 2005, the Authority responded to a break in the water main under River Hill Road. On that same date, a portion of an embankment constructed with fly ash adjacent to or bordering on River Hill Road,

Malerie Lane, and Manown Road collapsed into the valley in which Landowners' properties are located. Complaint, p. 28. Petitioners aver that the water main break occurred directly above and adjacent to the collapsing embankment, and that this event was a substantial contributing factor in causing the failure of the embankment. The physical properties of fly ash created a corrosive environment for the water main pipes which were not protected against such corrosive elements.

The collapse of the embankment, and resulting landslide of the materials into the valley in which the Landowners' properties are located, caused between 1,200 and 1,500 tons of fly ash to fall on and around Landowners' homes, contaminating the neighborhood and adjacent waterways.

Despite the fact that fly ash contains arsenic, following the landslide, DEP directed the Landowners to collect fly ash for later removal. The Landowners complied with that directive and believe that DEP had the collected piles moved to a park area where children play. DEP provided no notice to the Landowners regarding the arsenic in fly ash or the dangers the substance poses to the health of persons exposed to the substance. Further, in March 2005, the federal Agency for Toxic Substances and Disease Registry classified the Landowners' area as a "potential public health hazard." Para. 52 and 53.

The Landowners aver that DEP hired Weavertown Group as a clean-up contrac-

---

**2.** The Complaint alleges that fly ash is a "derivative of the coal combustion process" that is a regulated waste "composed of various heavy metal contaminants," and which contains, in this case, high levels of arsenic. Complaint, p. 29.

**3.** The Complaint alleges that the release of fly ash has necessitated the teenage daughter of Landowner Lenhart, Amanda Lenhart, to live

elsewhere because the fly ash has triggered her asthma. Also, Petitioner Denise Kohut does not live in the affected area; she is the parent of other named Petitioners who are adolescents and the Complaint alleges that she separated from her husband because of marital tension arising as a result of the fly ash release.

tor to abate the fly ash situation in the area. Weavertown, the Landowners assert, exacerbated the problem by hosing the fly ash down and directing it into nearby or adjacent waterways. The Landowners contend that, despite the remediation efforts some of the respondents have taken, "visible flyash remains in, or and around [their homes], on their properties, and on the banks of and in water bodies and streams in the neighboring area." Para. 44. Further, during dry periods, the wind will stir up the fly ash from the ground which enters their homes through openings and ventilation systems.

Despite a second cleanup attempt by Weavertown, Landowners' expert, NES, reported that Landowners continue to be exposed to fly ash contaminants with concomitant hazardous exposure, such as arsenic contamination exceeding DEP standards for residential soil, i.e., three to seven times greater than permitted under DEP standards. DEP has refused to conduct its own sample testing and has ignored NES' results. DEP has refused to seek Superfund designation. Such designation would have assured additional funds and more expedient cleanup. Further, DEP has not filed any affirmative action against a responsible party, including the other respondents, and will not take any further cleanup actions.

In an effort to cleanup the site and to remediate the condition of River Hill Road, DEP announced that it would allocate $500,000 for a complete cleanup and to stabilize the slope of the Road. DEP began an effort to stabilize the embankment in October 2006. However, NES, the Landowners' expert, expressed concerns to DEP and the subcontractor DEP hired for the stabilization project, URS Corporation, suggesting that the plan for stabilizing the embankment might create a situation in which more toxic fly ash could be released into the environment. The Landowners aver that they submitted written comments to be included in the administrative record associated with DEP's interim remedial plan for the slope, but that DEP never responded to the comments, despite a legal obligation to do so.

During the slope stabilization project, the subcontractor moved approximately 42,000 tons of fly ash from the site; however, after these efforts began, the Road moved and cracked and in early May, 2006 Landowners sought to alert DEP that they believed that the Road may once again collapse. On May 20, 2006, River Hill Road collapsed revealing the area beneath the roadway. The Landowners aver at paragraph 32 of the Complaint that "[b]ottom ash, a co-product of fly ash produced by coal combustion, was observed under the roadway and fly ash was found in the right-of-way, as well as in the slope abutting the road."[4] Landowners' expert, NES, determined that the storm water erosion control system DEP had implemented, the purpose of which was to prevent contaminated particles from being discharged into the neighboring waterways or neighborhood through water run-off, was insufficient to satisfy that purpose. Landowners aver that, as a consequence of this imperfect system, fly ash was again contaminating the neighborhood.

A second "Health Consultation" report ATSDR issued on June 1, 2006, demonstrated high levels of arsenic and consequentially harmful effects from the initial landslide when Landowners were engaged in activities bringing them in close contact with the fly ash. The arsenic present before the May 20th landslide presented a health concern for school-age children. The drafter of the report recommended

---

**4.** The Complaint does not indicate who made these observations.

that all visible fly ash should be removed from the neighborhood to ensure that arsenic levels do not create a health concern in the neighborhood. Further, although DEP has removed most of the exposed fly ash from the embankment area, DEP should ensure that the fly ash that continues to contaminate the neighborhood is removed. Finally, the report indicated that River Hill Road should be remediated and stabilized because the present instability creates a risk that additional landslides will occur.

The Landowners also aver that DEP should be responsible for long-term exposure concerns. The Landowners' expert, Dr. Edward Emmett, opined that data he has suggests that Landowners remain at an increased risk because of the inadequacy of DEP's cleanup and remedial measures. Because of the long-term exposure to arsenic, Dr. Emmett believes that the Landowners' health must be monitored to detect cancer at an early stage. The Landowners alleged that they have incurred response costs relating to testing, risk assessment, monitoring, exposure studies, slope stability studies, and slope remediation studies. Further, Landowners aver that their properties have been rendered valueless because of the contamination, and the Kellys have gone into, or will likely have to declare, bankruptcy for their neighborhood restaurant. Also, the Landowners, including their children, have lost the use and enjoyment of their property because of the contamination.

■■■ Based upon these allegations, the Landowners' complaint includes eighteen counts arising from the Clean Streams Law, the Air Pollution and Control Act, the Hazardous Sites Cleanup Act, common law private nuisance, common law public nuisance, and the Declaratory Judgment Act. Courts reviewing preliminary objections may consider not only the facts pleaded in the complaint, but also documents or exhibits attached to the complaint, and based upon the averments and documentary support may address challenges to the legal sufficiency of the complaint. In addressing the objections now before the Court, which generally assert that the Complaint fails to state a cause of action for which the Court may grant relief, we must regard all relevant and material facts, as well as documents and exhibits, as true, and sustain the objections only if those facts or documentary attachments clearly and without doubt could not support the requested relief as a matter of law. *McGriff v. Pennsylvania Board of Probation and Parole*, 809 A.2d 455 (Pa. Cmwlth.2002); *Whitpain Associates v. Whitpain Township*, 64 Pa.Cmwlth. 287, 439 A.2d 1334 (1982). Further, "[i]n ruling on preliminary objections in the nature of a demurrer, the Court need not accept as true conclusions of law, unwarranted inferences from fact, argumentative allegations, or expressions of opinion." *McGriff*, 809 A.2d at 458.

### 1. Allegheny Energy

We begin by addressing Allegheny Energy's preliminary objection to the Landowners' claim that Allegheny Energy violated the Pennsylvania Air Pollution Control Act (APCA), Act of January 8, 1960, P.L. (1959) 2119, 35 P.S. §§ 4001–4106. As Allegheny Energy notes, Section 8 of the APCA, 35 P.S. § 4008 provides as follows:

It shall be unlawful to fail to comply with or to cause or assist in the violation of any of the provisions of this act or the rules and regulations adopted under this act or to fail to comply with any order, plan approval, permit or other requirement of the department; or to cause a public nuisance; or to cause air pollution, soil or water pollution resulting

from an air pollution incident; or to hinder, obstruct, prevent or interfere with the department or its personnel in their performance of any duty hereunder, including denying the department access to the source or facility.... The owner or operator of an air contamination source shall not allow pollution of the air, water or other natural resources of the Commonwealth resulting from the source.

Allegheny Energy acknowledges that it generated the fly ash at issue, and took action to dispose of the fly ash. However, Allegheny Energy argues that none of its actions actually caused the air pollution that occurred. In response, Landowners assert that Section 8 of the APCA supports a conclusion that Allegheny Energy is an owner or operator of a source of air pollution. Landowners rely upon this Court's decision in *Kee v. Pennsylvania Turnpike Commission,* 685 A.2d 1054 (Pa. Cmwlth.1996), *affirmed,* 548 Pa. 550, 699 A.2d 721 (1997), in which the Court concluded that the Commissioner could be regarded to have caused air pollution through the operation of a service area parking lot even though the Turnpike Commissioner did not own the source of the pollution—the cars on the lot. However, Landowners' case is distinct from *Kee,* because the pleaded facts do not establish the Allegheny Energy owns the roadway from which the fly ash escaped. Nor do the facts allege that Allegheny Energy remained owner of the fly ash after it engaged the services of the disposal agent who removed the fly ash from Allegheny Energy's possession and control.

Landowners recommend that the Court reject Allegheny Energy's reliance on the fact that it relinquished ownership and control over the fly ash and rather consider whether its actions created conditions that resulted in a public nuisance. Thus,

Landowners argue, because Section 8 makes the creation of a public nuisance a violation of the Act, if Allegheny Energy's conduct does amount to a public nuisance, then the conduct would also be a violation of the APCA.

Because the Landowners have pleaded a separate claim under a public nuisance theory of recovery, we will address Allegheny Energy's objections to that claim as well here in our discussion of the APCA. Section 821B of the Restatement of Torts defines a public nuisance as

(1) ... an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Allegheny Energy argues that the Landowners' public nuisance claim fails because Allegheny Energy has never had possession or control over the site. Contrary to the Landowners' position, Allegheny Energy has offered support for the proposition that a petitioner must establish that the party charged with creating a public nuisance had possession or control over the site from which the nuisance originates. The federal Court of Appeals in *City of Philadelphia v. Beretta U.S.A. Corp.,* 277

F.3d 415, 421 (3rd Cir.2002) relied upon several decisions of Commonwealth appellate courts, including Commonwealth Court for the proposition that, in order for a claim of public nuisance to be actionable, a plaintiff must allege that the defendant had some degree of control over the nuisance.

 The term "nuisance" contemplates the unreasonable use by one person of his personal or real property such as to create an interference with the activities or pursuits of another. *Groff v. Borough of Sellersville*, 12 Pa.Cmwlth. 315, 314 A.2d 328 (1974). In this case, the Landowners do not allege that Allegheny Energy owned the fly ash at the time of the landslide. Nor do they aver that Allegheny Energy had the power to control the property upon which the fly ash had been deposited. The Court does not agree with the Landowners that the mere generation of the fly ash is sufficient to support a claim of public nuisance against Allegheny Energy.

The Complaint does not aver sufficient facts to demonstrate that Allegheny Energy engaged in any conduct that caused a public nuisance. Allegheny Energy, while admitting it engaged the services of a company to dispose of the fly ash, relinquished control of the fly ash, and the transporter acquiring the fly ash controlled the disposal of the materials. Although the dispersion of fly ash throughout the affected community might constitute a nuisance, Landowners have failed to connect Allegheny Energy's generation and dispossession of the fly ash with the incident that has caused the alleged harm. Allegheny Energy's conduct with regard to the fly ash is simply too remote for the Landowners to state a viable claim under the APCA. Accordingly, we sustain Allegheny Energy's preliminary objections to both the APCA claim as well as the public nuisance claim.

 Allegheny Energy next objects to the Landowners' private nuisance claim. The courts of the Commonwealth follow the description of private nuisance developed in the Restatement (Second) of Torts. Private nuisances are "nontrespassory invasion[s] of another's interest in the private use and enjoyment of land." 4 Restatement Torts, 2d, § 821D, p. 100. Section 822 of the Restatement sets forth the elements of liability for private nuisance as follows:

> One is subject to liability for private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either:
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

 In evaluating a private nuisance claim, the key question is whether one person has impaired another person's private right of use or enjoyment of their land. The Restatement indicates that "any one of the types of conduct that serve in general as the bases for all tort liability may invade a person's private right of use or enjoyment of their land." A defendant may be liable for the invasion of such use and enjoyment when the interference is intentional and unreasonable or the result of negligent, reckless or abnormally dangerous conduct. *Id.* Hence, the first question to consider is whether the fly ash dispersion constitutes an invasion of the Landowners' private use and enjoyment of the land. The pleaded facts do support such a conclusion as Landowners have alleged that the fly ash landslide resulted in the deposition of fly ash on their property

and that they no longer have the use and enjoyment of their property because of the toxic nature of the fly ash.

However, under the elements of such a claim, the Landowners are required to demonstrate through their pleading that (1) Allegheny Energy's conduct was the legal cause of the invasion and (2) Allegheny Energy's conduct was intentional and unreasonable or reckless, negligent, or abnormally dangerous. Courts in Pennsylvania have concluded that a private nuisance existed where dust from a truck stop caused health problems to employees, *Harford Penn–Cann Service, Inc. v. Zymblosky*, 378 Pa.Super. 578, 549 A.2d 208 (1988), but no private nuisance occurred when dust from a neighboring business did not cause health problems or affect daily activities, *Karpiak v. Russo*, 450 Pa.Super. 471, 676 A.2d 270 (1996).

The invasion of the interest may be intentional or unintentional. The conduct of a person who intentionally invades such an interest must have been unreasonable under the circumstances for the interest owner to obtain relief, whereas, a person who unintentionally interferes with the use or enjoyment of another's land must have acted negligently, recklessly, or abnormally dangerously. Section 825 of the Restatement defines the term "intentional invasion" as follows:

> An invasion of another's interest in the use and enjoyment of land or an interference with the public right, is intentional if the actor
>
> (a) acts for the purpose of causing it, or

(b) knows that it is resulting or is substantially certain to result from his conduct.

We agree with Allegheny Energy that the Landowners have not pleaded facts in support of an intentional interference with the use and enjoyment of their land. The Landowners have pleaded only that Allegheny Energy engaged in a contract with another business to dispose of the fly ash. The Landowners have not alleged that Allegheny Energy placed the fly ash under the road surface or in the embankment, but only that Allegheny Energy arranged for the placement of the fly ash in the area. Nor have the Landowners pleaded that Allegheny Energy either acted for the purpose of causing the invasion or knew that its actions in engaging the contractor's services were "substantially certain to result" from the contract. Accordingly, we need not consider whether an intentional and unreasonable invasion occurred.[5]

The Landowners also assert that Allegheny Energy acted with negligence and therefore the question of intention is irrelevant. In considering this claim, we begin by considering whether Allegheny energy's conduct was the legal cause of the alleged harm to Landowners. In order to constitute the legal cause of an invasion of their interest, the Landowners must plead facts showing that Allegheny Energy's conduct was a substantial factor in causing the harm to the Landowners' interests. In considering this question, the Restatement of Torts again provides

---

5. Landowners also correctly assert that, although an invasion may initially be unintentional, the actor's failure to take action to abate an ongoing nuisance may turn into an intentional invasion. However, under the circumstances of this case, we conclude that Allegheny Energy cannot be said to be invading the Landowners' use and enjoyment. The facts indicate that the governmental entities and property owners of the land on which the fly ash was placed have control over the land and the fly ash. Accordingly, we disagree with the Landowners' argument that Allegheny Energy has acted intentionally.

some insight. Section 433 supplies us with the following:

Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

c) lapse of time.

In applying these considerations to the pleaded facts, we conclude that Allegheny Energy's conduct was not a substantial factor in bringing about the harm to the Landowners' interests. The facts indicate that the fly ash was deposited in the area approximately forty years before the alleged harm occurred. Thus, there is a significant lapse of time between the date of Allegheny Energy's conduct and the time of the landslide. Also, the pleaded facts demonstrate that the Landowners acknowledge the intervening actions of other defendants, and potentially those of the contractor who deposited the fly ash in 1964. Predominant among these, after reviewing the complaint, are: the Department of Transportation's construction and maintenance of the roadway and the Municipal Authority's maintenance of its water main. The Court makes no great assumption here by concluding that the fly ash, which apparently remained inert during a forty-year period, only became harmful after being accepted or used by other landowners or actors. We conclude that Allegheny Energy's conduct was not a substantial factor in causing the harm alleged to have occurred. Based upon the foregoing discussion, we will sustain this preliminary objection.

■ Finally, Allegheny Energy preliminarily objects to the Landowners' claim for damages for diminution of property value under the Hazardous Site Cleanup Act (HSCA), Act of October 18, 1988, P.L. 756, 35 P.S. §§ 6020.101—6020.1305. Allegheny Energy argues that the HSCA does not allow for such damages and that therefore, the Court should strike that part of the Landowners' claim under the Act that seeks such damages. As Allegheny Energy notes, section 702(a) of the Act, 35 P.S. § 6020.702(a), limits the recovery of private individuals to "reasonable and necessary or appropriate costs of response incurred."

In response, the Landowners argue that Allegheny Energy's preliminary objection is premature because the question of whether diminution of property value as a response cost under the HSCA is fact sensitive. The Landowners correctly assert that this Court is not bound by the unpublished decisions of the federal courts that Allegheny Energy has cited in support of its position, and suggest that the Court consider two decisions of our Supreme Court, *Redland Soccer Club v. Department of the Army*, 548 Pa. 178, 696 A.2d 137 (1997) and *Centolanza v. Lehigh Valley Dairies*, 540 Pa. 398, 658 A.2d 336 (1995), for guidance in resolving this issue.

The Court in *Redland* noted the following pertinent statutory provisions of the Hazardous Sites Cleanup Act, 35 P.S. §§ 6020.702 and 6020.1115:

§ 1115. Citizen suits

(a) General rule.-A person who has experienced or is threatened with personal injury or is threatened with personal injury or property damage as a result of a release of a hazardous substance may file a civil action against any person to prevent or abate a violation of this act or of any order, regulation, standard or approval issued under this act.

(b) Jurisdiction.-The courts of common pleas shall have jurisdiction over any actions authorized under this section. . . . The court may grant any equitable relief; may impose a civil penalty under section 1104; and may award litigation costs, including reasonable attorney and witness fees, to the prevailing or substantially prevailing party whenever the court determines such an award is appropriate.

§ 702. Scope of liability

(a) General rule.—A person who is responsible for a release or threatened release of a hazardous substance from a site as specified in section 701 is strictly liable for the following response costs and damages which result from the release or threatened release or to which the release or threatened release significantly contributes:

(1) Costs of interim response which are reasonable in light of the information available to the department at the time the interim response was taken.

(2) Reasonable and necessary or appropriate costs of remedial response incurred by the United States, the Commonwealth or a political subdivision.

(3) Other reasonable and necessary or appropriate costs of response incurred by any other person.

(4) Damages for injury to, destruction of or loss of natural resources within this Commonwealth or belonging to, managed by, controlled by or appertaining to the United States, the Common-

wealth or a political subdivision. This paragraph includes the reasonable costs of assessing the injury, destruction or loss resulting from such a release.

(5) The cost of a health assessment or health effects study.

■■■ In *Redland*, the Supreme Court considered the request in a citizen suit brought under the Act to recover the costs of medical monitoring by the establishment under the authority of Section 1115(b) of a medical trust fund, arguing that Section 702(a), though not explicitly iterating such a recovery item, encompassed a medical monitoring system, based upon the definition of the term "response," which is:

Action taken in the event of a release . . . of a hazardous substance . . . into the environment to study, assess, prevent, minimize or eliminate the release in order to protect the present or future public health, safety or welfare or the environment. The term includes, but is not limited to:

. . .

(2) Actions at or near the location of the release, such as studies; health assessments; . . . and monitoring and maintenance reasonably required to assure that these actions protect the public health, safety, and welfare and the environment.

. . .

(5) Other actions necessary to assess, prevent, minimize or mitigate damage to the public health, safety or welfare or the environment which may otherwise result from a release . . . of hazardous substances. . . .

Section 103 of the Act, 35 P.S. § 6020.103.

However, the Supreme Court's rationale for concluding that medical monitoring costs constituted a "response" under the Act is distinguishable from the present

claim for diminution of property value. Such damages are not specifically included within the definition of "response" and would do nothing to "assess, prevent, minimize or mitigate damage to the public health." Section 103(5), 35 P.S. § 6020.103(5).

Further, we agree with Allegheny Energy's argument that the Landowners' reliance upon *Centolanza* is misplaced. Although the Supreme Court did conclude that diminution of property value was a proper item of damages recoverable under the Storage Tank and Spill Prevention Act (STSPA), Act of July 6, 1989, P.L. 169, 35 P.S. §§ 6021.101—6021.2104, the Court reached its decision as a matter of statutory construction, which it recognized proceeded in a vacuum because of the General Assembly's failure to fully describe the nature of damages available under that particular act. However, in this case, the General Assembly described the types of damages that are recoverable under the HSCA. While we agree with, and are bound by, the Supreme Court's reasoning in *Redland* as to medical monitoring costs, we believe that the language of the Act does not encompass damages for diminution in property values. Although the Act, like the STSPA, is remedial in nature, for the reasons expressed above, we have no difficulty in interpreting the definition of the term "response" not to include diminution of property values. Accordingly, we sustain Allegheny Energy's preliminary objection seeking an order striking the request in Paragraph 249, sub-paragraph (h) of the prayer for relief, and any other such request in the Complaint.

## 2. *Municipal Authority of Westmoreland County*

The Municipal Authority of Westmoreland County (MAWC) has filed preliminary objections seeking an order (1) striking numerous paragraphs in the Complaint as being impertinent, (2) striking other paragraphs that raise claims under the Clean Streams Law, the Air Pollution Control Act, the Hazardous Sites Cleanup Act, and (3) private and public nuisance causes of action.

We begin by addressing the objections seeking to strike paragraphs allegedly containing impertinent material. Pennsylvania Rule of Civil Procedure No. 1028(a)(2) allows a party to file such objections. In this case, MAWC contends that the Landowners' pleadings go beyond the material facts that the Rules of Civil Procedure direct to be included in a complaint. Thus, any paragraphs that purport to be factual, but are simply evidence that might be relevant in a trial or hearing are not pertinent for the purposes of pleading a cause of action.

This Court has stated that facts that are immaterial and inappropriate to establish a cause of action constitute impertinent material. *Jubelirer v. Rendell,* 904 A.2d 1030, 1033 (Pa.Cmwlth.2006), quoting *Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 115 (Pa.Cmwlth.1998). MAWC acknowledges that courts may regard such pleadings as simple surplusage and need not sustain every averment that is not pertinent to the cause of action, but that trial courts, as recognized in 4 Standard Pennsylvania Practice 2d, § 16:60, have sustained such objections when the averments are either prejudicial or create confusion. MAWC notes in particular that the Landowners attached expert reports to the Complaint and that, rather than evaluate experts' opinions and plead facts based upon those reports, the Complaint incorporates such information in a form that simply states what the experts' opinion are. The Landowners respond by arguing that the manner in which it has pleaded its experts' opinions and their attaching evidentiary documents to the Complaint nei-

ther cause MAWC to be prejudiced nor cause confusion. The Landowners believe that MAWC would have no difficulty responding to the averments in their present form.

Before proceeding to resolve this issue, we will quote portions of two of the paragraphs MAWC seeks to have stricken. Paragraph 32 avers: "Plaintiff's expert, Neumeyer Environmental Services ('NES'), has documented the presence of the fly ash and coal waste and has opined that they were intentionally used by Penn-Dot as structural materials to create and support the roadway. NES's report is attached hereto as Exhibit 1.'" Paragraph 35 of the Complaint alleges that "Plaintiff's expert, NES, opined that the initial mechanism for the fly ash landslide was the presence of significant amounts of water that could not be explained by a natural source."

■ Although we agree with MAWC that many of these averments relate solely to evidentiary matters, we believe that MAWC will be able to respond to the problem paragraphs as illustrated above, either by indicating that it understands the nature of the opinions of the Landowners' experts, but denies the veracity of those opinions, or that it has no knowledge of the particular opinion or evidence reflected in the pleading. Accordingly, we will overrule this preliminary objection regarding the particular averments, and the Court will regard the attached evidentiary exhibits as mere surplusage.

■ MAWC's next objection is that the Landowners' complaint fails to state a cause of action against MAWC under the Clean Streams Law. The thrust of this argument is that the Law allows recovery against only actors who have exercised some dominion or control over the polluting substance. MAWC refers to Section 301 of the Law, 35 P.S. § 691.301, which provides as follows:

No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

Section 401 of the Law, 35 P.S. § 691.401 similarly prohibits "persons" from putting or placing, or allowing or permitting a discharge, into the waters of the Commonwealth, another substance that results in pollution. Finally, Section 307 of the Law, 35 P.S. § 691.307 permits the direct or indirect discharge of industrial waste into the waters of the Commonwealth only if the rules or regulations of the Department of Environmental Resources allow such discharge.

MAWC asserts that, although the Law does not define the act of putting or placing a substance into the waters of the Commonwealth, common sense suggests that in order for a person to put or place such substances into the Commonwealth's waters, they must have some dominion or control over the substance. Thus, MAWC argues, because the Landowners have pleaded only that MAWC's damaged pipe discharged water, and not that the discharged water was polluted, the Complaint is insufficient under the Law to state a claim against MAWC.

The Landowners rely upon the language of the above-cited provisions that liability can arise from ownership of property, rather than simply control of the substance: "It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person ... any substance of any kind or

character resulting in pollution." Section 401 of the Law.

Thus, the Landowners assert, MAWC permitted water to be discharged from its pipe a substance (water) that resulted in pollution when the water caused the landslide. The Landowners rely upon this Court's decision in *Western Pennsylvania Water Company v. Commonwealth, Department of Environmental Resources,* 127 Pa.Cmwlth. 26, 560 A.2d 905 (1989), in which this Court considered whether the Department of Environmental Protection could assert a claim under Section 316 of the Law, 35 P.S. § 691.316, against a water company in possession of a permanent easement for the purpose of laying pipes for water distribution whose conduct in digging and moving dirt around an old oil well caused the oil to contaminate surrounding soil. This Court noted that the water company was "in actual possession of the easement since its water pipeline is buried there not just temporarily but continually as a result of a permanent easement granted to [the company] forever." *Id.* at 908. MAWC has not addressed the Landowners' argument that MAWC has a similar easement such that would, at least **under Section 316,** provide authority for the **Department** to assert a claim under that particular section. However, the precise language of Section 316, is different from that of Section 407. Rather than specifically including a definition of the term "occupied" in Section 401 similar to the definition of "landowner" in Section 316, the General Assembly did not provide additional language to aid in interpretation of the term. Thus, this Court is left to consider, in the absence of a specific definition, whether the term "occupied" encompasses owners of easements.

▮ Although courts may consult the rules of statutory construction for assistance in seeking to construe the meanings of statutory provisions, we do not believe we need to delve into the distinctions between the terms "landowner" and "occupied" in order to conclude that owners of easements are encompassed under Section 401's reference to persons who occupy land. Although the *Western Pennsylvania Water Company* case involved a landowner, Section 316 applies to persons occupying land as well as landowners. We do not believe we stretch the language of Section 401 by concluding that the conduct to which it refers includes persons who occupy by virtue of an easement. Because MAWC may be the owner of an easement (MAWC does not dispute this issue) and thus an occupier of the land, Section 401 prohibited MAWC to permit pollutants to be discharged from the area it occupied. Accordingly, we will overrule MAWC's preliminary objection to the Landowners' claim under the Clean Streams Law.

▮ MAWC objects to the Landowners' claim under the Air Pollution Control Act. Section 8 of the Act, 35 P.S. § 4008 provides in pertinent part:

It shall be **unlawful** to fail to comply with or to cause or assist in the violation of any of the provisions of this act or the rules and regulations adopted under this act or to fail to comply with any order, plan approval, permit or other requirement of the department; or **to cause a public nuisance;** or **to cause air pollution, soil or water pollution resulting from an air pollution incident;** or to hinder, obstruct, prevent or interfere with the department or its personnel in their performance of any duty hereunder. . . . The owner or operator of an air contamination source shall not allow pollution of the air, water or other natural resources of the Commonwealth resulting from the source.

(Emphasis added.)

Also, the Act defines air pollution as:

The presence in the outdoor atmosphere of any form of contaminant, including, but not limited to, the discharging from stacks, chimneys, openings, buildings, structures, open fires, vehicles, processes or any other source of any smoke, soot, fly ash, dust, cinders, dirt, noxious or obnoxious acids, fumes, oxides, gases, vapors, odors, toxic hazardous or radioactive substances, waste or any other matter in such place, manner or concentration inimical or which may be inimical to the public health, safety or welfare or which is or may be injurious to human, plant or animal life or to property or which unreasonably interferes with the comfortable enjoyment of life or property.

Section 3 of the Act, 35 P.S. § 4003.

Essentially, MAWC argues that the Act permits a finding of responsibility only when an actor has some dominion or control over the discharge of the pollution-causing agent. MAWC contends that its water did not release the fly ash into the air, and that the Landowners' averment that "[f]ly ash, when dry, is a dust and was, and continues to be, emitted into the ambient air ...," Complaint, paragraph 189, supports MAWC's position that the water did not cause air pollution, because the water would have made the fly ash wet and the pollution-causing release could not have occurred until the fly ash dried.

The Landowners respond with two arguments: (1) MAWC's water was a contributing cause in the pollution event because the water propelled the fly ash into the community and the fly ash ultimately entered the air when the water that carried it evaporated; and (2) MAWC's conduct created a public nuisance, which the Act, under Section 8 of the Act as quoted above, is unlawful conduct under the Act. The Landowners assert that the landslide that caused the discharge of the fly ash

would not have occurred if MAWC had maintained its pipes in proper condition.

MAWC is not the owner or operator of an air-contamination source. However, we will consider the questions of whether MAWC caused a public nuisance or air pollution, or soil or water pollution from an air pollution incident.

With regard to public nuisance, we note again that Section 821B of the Restatement of Torts defines a public nuisance as

(1) ... an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

As we discussed above with regard to the Landowners' claims that Allegheny Energy had created a public nuisance, the Landowners have not alleged facts that establish that MAWC had any control over the nuisance. *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3rd Cir.2002). A "nuisance," as mentioned above, contemplates the unreasonable use by one person of his personal or real property such as to create an interference with the activities or pursuits of another. *Groff*. Although MAWC may have had

some degree of control over its easement, the Landowners do not allege that MAWC controls the fly ash. Nor do they aver that MAWC had control over the land upon the fly ash had been deposited.

The questions that remain are whether MAWC caused air pollution or caused air or soil pollution from an air pollution event. Section 4008 does not describe what conduct may constitute the "cause" of air pollution, or the pollution of water or soil from an air pollution incident. As noted above, in negligence actions, the question of whether a party's conduct is a legal cause of the alleged harm depends on whether the conduct was a substantial contributing factor in bringing about the harm. In our discussion above concerning Allegheny Energy's conduct, we noted the considerations Section 433 of the Restatement of Torts set forth as significant to such an inquiry: (1) the number of other factors involved in bringing about the harm and the nature of their effect; (2) whether the party's conduct set in motion the factors that ultimately brought about the harm, or whether other forces, for which the actor is not responsible, set in motion actions that prompted an otherwise inert situation to bring about the harm; and (3) lapse of time.

In this case, the pleadings suggest that, were it not for the chemical interaction between properties of the fly ash, which the Landowners allege caused the water main to break, the fly ash slide would not have occurred. However, at this point of the proceedings, the Court believes we cannot conjecture as to the precise degree of culpability involved amongst the respondents with regard to the legal cause of the fly ash slide. Accordingly, although we do not conclude that the pleadings clearly establish MAWC's liability under a public nuisance theory, the Landowners may be able to establish liability based upon MAWC's maintenance of its water main. Accordingly, we will overrule this preliminary objection.

 MAWC also objects to the public nuisance claim in Count XVII. For the reasons suggested above in our discussion of public nuisances in the context of the HSCA, we will sustain MAWC's preliminary objections to the public nuisance claim against MAWC. However, we will overrule MAWC's objection to the private nuisance claim. MAWC relies on the pleading in the Complaint asserting that the invasion is trespassory in nature and thus cannot constitute a private nuisance, which by definition refers only to nontrespassory invasions. However, as the Restatement of Torts 2d points out in Section 821D, note e, p. 102, "[i]f the interference with the use and enjoyment of the land is a significant one, sufficient in itself to amount to a private nuisance, the fact that it arises out of or is accompanied by a trespass will not prevent recovery for the nuisance." Based upon the foregoing, we will overrule this preliminary objection.

 MAWC objects to the Landowner's claim under the Hazardous Sites Cleanup Act. We agree with MAWC's position that it is not a responsible person under the Act. The definition of the term "responsible person" in Section 701 of the Act, 35 P.S. § 6020.701, refers to the conduct that may make such persons subject to liability for violations of the Act. Owners or operators of such sites may be liable. However, MAWC does not fall within the definition of an owner or operator of a site. See Section 103 of the Act, 35 P.S. § 6020.103. "Nor does MAWC generate, own, or possess a hazardous substance or arrange for the disposal of such substance, or accept such substances for transport to disposal or treatment facilities." Subsections (a)(2) and (3), 35 P.S. § 6020.701(a)(1) and (2). The Complaint avers no facts

that would support a finding or conclusion that MAWC is a responsible person under the Act. Accordingly, we sustain this preliminary objection and need not address the objection regarding the Landowners' request for damages for diminution of property value, but will note that, for the reasons stated above in our discussion of Allegheny Energy's claim, we would conclude that the Landowners would not be entitled to such costs.

Accordingly, we sustain this preliminary objection.

### 3. The Commonwealth Defendants

The Department of Environmental Protection (DEP) and the Department of Transportation (DOT) have filed a joint brief in support of their preliminary objections and this Court shall address the objections, where appropriate, together.

■ We begin by noting that, although the Landowners have indicated in the introduction to their complaint that this matter involves a citizens' suit, their prayer for relief also asserts that they are seeking to have DEP perform mandatory duties set forth in the Act, i.e., investigate and abate, if necessary, a hazardous waste site. We note that this request for relief, while included in their request for injunctive relief, sounds more like a mandamus action. The Landowners have pleaded facts indicating that DEP has initiated, at least, some action with regard to the embankment area from which the fly ash originated; however, the averments place in question: (1) whether DEP has included the neighboring area within the scope of investigation and abatement; and (2) whether any action complies with mandatory duties DEP may have with respect to the Landowners' property. As such, the Court believes that factual issues prevent the Court from sustaining DEP's preliminary objec-

tion challenging the claims arising under the HSCA.

In *Odette's, Inc. v. Pennsylvania Department of Conservation and Natural Resources*, 699 A.2d 775 (Pa.Cmwlth.1997), this Court considered a mandamus action in which an owner sought to compel the Department of Conservation and Natural Resources to perform its duties under the Dam Safety and Encroachment Act, Act of November 26, 1978, P.L. 1375, *as amended*, 32 P.S. §§ 693.1–693.27. The Department responded with the argument that mandamus did not lie to compel the question as to whether the Department had fulfilled mandatory duties under the Act. We believe that the same reasoning is applicable to this case, which admittedly arises under a different environmental law. The Landowners' request for relief does not seek that the Department perform its duties in a particular way. Rather the Complaint asserts that the Department has a duty to investigate and remediate in the neighborhood as well as on the slope. The action is similar to the request in *Odette's* for a writ of mandamus directing the Department to investigate and remediate. In *Odette's* this Court agreed that the petitioner there could not obtain relief directing the manner in which the Department responded in fulfilling its duties, but that the law required it to investigate and, if necessary engage in remedial action. That is precisely what the HSCA directs the Department to do: "Develop, administer and enforce a program to provide for the investigation, assessment and cleanup of hazardous sites in this Commonwealth.…" Section 301(1) of the HSCA, 35 P.S. § 6020.301(1). In this case, the Landowners allege that the Department has failed to comply with this directive as it may relate to their properties, but the Landowners also specifically recognize that the Department has discretion as to how to investigate and remediate. *See*

*Prayer for Relief, Section V, para. (b) of the Complaint.*

Additionally, because we believe that there are factual issues regarding DEP's response to the area of the Landowners' property, we are not convinced that Section 508(b) of the HSCA, 35 P.S. § 6020.508(b) precludes this Court's exercise of jurisdiction. DEP asserts that the heart of the Landowners' claims against DEP lies in their belief that DEP's responses to the fly ash incidents were inadequate. Section 508(b) of the Act provides:

> Timing of review.—Neither the board nor a court shall have jurisdiction to review a response action taken by the department or ordered by the department under section 505 until the department files an action to enforce the order or to collect a penalty for violation of such an order or to recover its response costs or in an action for contribution under section 705.

DEP argues that it undertook the actions described in the Complaint under the authority granted by the Hazardous Sites Cleanup Act, and therefore, under Section 508(b) this Court does not have jurisdiction to review DEP's response because none of the conditions for such action described in that section have yet occurred. DEP cites a decision of a federal court arising under the Comprehensive Environmental Response, Compensation and Liability Act (commonly referred to as CERCLA), *Clinton County Commissioners v. United States, Environmental Protection Agency,* 116 F.3d 1018 (3d Cir.1997), *cert. den.,* 522 U.S. 1045, 118 S.Ct. 687, 139 L.Ed.2d 633 (1998). DEP suggests that, because CERCLA and the HSCA are similar, *Clin-*

ton County, which involved a federal CERCLA provision similar to Section 508, provides insight into the Landowners' HSCA claim.

The Landowners have averred that DEP has taken action with regard to the slope from which the release of fly ash occurred; however, they have not averred that DEP has taken any action with regard to their residential neighborhood.[6] As the Commonwealth notes, the decision in Clinton County stands for the proposition that, if the environmental authorities do not take action with regard to a hazardous site, a citizens group may file an action against responsible parties to abate a nuisance. Thus, because the Landowners' position is that DEP has not taken action to abate the fly ash condition in their neighborhood and on their properties, the Clinton County decision actually supports the Landowner's claim. At the least, this position presents a factual issue of whether the action DEP has taken indicates that the subject site is limited to the slope area, excluding the neighborhood. Because we believe that there are factual disputes that, if resolved in favor of the Landowners, could provide them with some of the relief they seek, we will overrule this demurrer as to both DEP and DOT.

▪ Furthermore, we cannot agree with the Commonwealth that the Landowners have not stated a cause of action under the citizen suit provision of the HSCA. The Commonwealth asserts that there are four elements to a citizens' suit: (1) the citizens have experienced or are threatened with personal injury or property damage; (2) the real or potential injury or damage is or will be caused by a hazardous substance; (3) the defendants are

---

6. The Landowners have averred that DEP asked the Landowners to collect visible fly ash for collection. However, we believe that this single averment is insufficient to support the conclusion that this request constituted a response action such as would preclude this Court's exercise of jurisdiction under Section 508.

"responsible persons" under Section 701 of the Act; and (4) the defendants violated the HSCA or an order, regulation, standard, or department approval. In this case, we believe that the Landowners have averred facts that could potentially support a claim under the HSCA.

We begin by noting that, as recognized above, the Landowners have not sought monetary damages except for diminution of property values. We have already concluded above in our discussion of Allegheny Energy's preliminary objections, that the Act makes no provision for the recovery of such costs. Also for the reasons stated above, namely the question of whether DEP has failed to perform a mandatory duty, we will overrule this demurrer.

With regard to DOT, the Commonwealth asserts that the Landowners have failed to plead sufficient facts to establish that DOT is a responsible person. However, we believe that the averments are sufficient to establish that DOT is a responsible person. The Commonwealth contends that Section 703 of the HSCA provides DOT with immunity; however, that immunity is limited to damages. As discussed above, the Landowners' primary request is for the abatement of the hazardous condition.

■ The Commonwealth's next preliminary objection asserts that the Landowners, in Counts I and IV (addressed respectively to DEP and DOT), have failed to state a claim for which the Court may grant relief under the Pennsylvania Clean Streams Law (CSL).

DEP asserts that the Law authorizes only actions for injunctive relief and litigation costs, and not damages or cost reimbursement. In their brief in response to the Commonwealth's preliminary objections, the Landowners affirmatively state that they are not seeking monetary damages. *See Petitioners' Brief in Support of Their Response to Preliminary Objections Filed by [DOT and DEP], p. 12.* Accordingly, we see no need to address this specific argument. The Commonwealth relies further upon Section 508 of the HSCA to support its position that citizens cannot seek to direct DEP how to perform its discretionary functions. However, based upon our conclusion above regarding the HSCA and the factual issues that remain, we need not consider this argument and will overrule the preliminary objection to the Landowners' claim under the CSL against DEP and DOT.

Similarly, with regard to the Air Pollution and Control Act, the Commonwealth objects to the Landowners' claims. As noted above, the Landowners have acknowledged at page 12 of their brief that they are not seeking damages, but only injunctive relief. Additionally, for the reasons discussed above, we cannot conclude at this stage that Section 508 of the HSCA precludes the Landowners' equitable claim under the Air Pollution Control Act. Therefore, we overrule this objection.

■ The Commonwealth next argues that this Court lacks jurisdiction to consider a constituent common law nuisance action against DEP or DOT. *Pastore v. State System of Higher Education,* 152 Pa. Cmwlth. 111, 618 A.2d 1118, 1123 (1992). In *Pastore,* the owners of a residential development alleged an injury to them resulting from water flowing from an owner of higher land, the State System of Higher Education. The owners filed a complaint in this Court asserting various claims under statutory provisions and also a claim in "negligence or nuisance." The Court noted that, under Section 761 of the Judicial Code, 42 Pa.C.S. § 761, although the Court generally has original jurisdiction over claims against Commonwealth parties,

Section 761 excludes certain actions, among which are "actions or proceedings conducted pursuant to Chapter 85" and "actions in the nature of trespass as to which the Commonwealth government formally enjoyed sovereign or other immunity and ... or proceedings in the nature of assumpsit relating to such actions or proceedings in the nature of trespass."

The Court opined that the claim "based on negligence clearly falls with Chapter 85 of the Judicial Code and is also an action in the nature of trespass as to which the Commonwealth formerly enjoyed sovereign immunity," id., thus foreclosing the power of the Court to try a negligence or nuisance action.

In response, the Landowners assert that the Court should not rely upon Pastore, because unlike that case, the Landowners are not seeking damages, but only abatement of the alleged nuisance. They direct us to our Supreme Court's decision in Stackhouse v. Commonwealth, 574 Pa. 558, 832 A.2d 1004 (2003), in which that Court considered the claims of a State Police employee, Diane Stackhouse, who challenged the actions of the State Police in the conduct of their internal investigation of Stackhouse in connection with her application for a promotion. Her challenges alleged that the persons who conducted the investigation were not properly trained for that function and that consequently in the course of their investigation they exceeded the scope of their inquiries into personal matters and that the Commissioner and Deputy Commissioner, while not personally involved with the investigation failed to take measures to correct the situation.

The Landowners' position appears to be correct. Although the Court would not generally have original jurisdiction over an isolated nuisance action, these particular nuisance claims arise in certain aspects of the complaint under the statutory provisions that make the creation of a nuisance a subject of judicial review. Further, as the Landowners point out the Complaint significantly seeks equitable relief rather than monetary relief. Thus, as the Supreme Court concluded that the inclusion by Stackhouse of a single declaratory judgment claim within a Complaint that sounded largely in tort could not vest this Court with jurisdiction, we conclude that the ancillary jurisdiction rule set forth in Section 761(c) of the Judicial Code does vest this Court with ancillary jurisdiction over the Landowners' nuisance claims because they arise in the context of claims arising under statutory provisions and seek equitable relief in the form of abatement rather than money damages.

The Commonwealth parties also assert that the Landowners have failed to state a cause of action under the Declaratory Judgments Act, Sections 7531–7541 of the Judicial Code, 42 Pa.C.S. §§ 7531–7541. We conclude that the Landowners may be able to establish a right to a declaration concerning their rights and accordingly overrule this preliminary objection.

 The Commonwealth also contends that the Landowners have failed to join an indispensable party, George and Anne Scagline, who the Commonwealth asserts own the property on which the fly ash slide occurred and that consequently, the Court should dismiss the Complaint. The Commonwealth acknowledges that it owns a slope easement over a portion of the site. As noted, when a party's rights are so connected to the claims of the litigants such that a court could not enter an order without impairing those rights, the party is indispensable to the proceedings. Polydyne, Inc. v. City of Philadelphia, 795 A.2d 495 (Pa.Cmwlth.2002). In considering whether a party is indispensable, the Court must evaluate the following criteria:

1. Do the absent parties have a right or interest related to the claim?

2. If so, what is the nature of the right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating due process rights of absent parties?

*Montella v. Berkheimer Associates,* 690 A.2d 802 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 548 Pa. 675, 698 A.2d 597 (1997). The Commonwealth asserts that the Scaglines have an essential interest in this claim because the Court could render determinations with consequences that could subject the Scaglines to liability.

The Landowners' Complaint expressly contends that the failure that caused the fly ash slide occurred under the roadway and its embankment. Despite the decisional law the Commonwealth cites for the proposition that the Scaglines are owners of the roadway, we reject this argument. As the Landowners note, at least under the HSCA, DEP has discretion as to which responsible persons it may seek to pursue for cleanup purposes. Although the Landowners have brought claims under additional theories of liability, following trial, the Court's function is to determine which of the named respondents may be subject to the relief requested. Thus, following the development of a record, the Court may determine that one or more of the named respondents are subject to an abatement order or that none of the respondents are subject to liability. Under the legal notion that DOT maintains the highways, and the substructure of the highways, we cannot conclude that the Scaglines are indispensable to this proceeding.

### 4. Weavertown Environmental Group

■ Weavertown first asserts that the Landowners fail to state a cause of action under the HSCA because they have failed to aver facts that would support a conclusion or finding that Weavertown is a "responsible person" under Section 701(a) of the HSCA. We agree. The facts allege that the Department of Environmental Protection engaged the services of Weavertown to assist in the cleanup of the landslide. Section 701, which defines the expression "responsible persons" provides in pertinent part:

[A] person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:

(1) The person owns or operates the site:

(i) when a hazardous substance is placed or comes to be located in or on a site;

(ii) when a hazardous substance is located in or on the site, but before it is released; or

(iii) during the time of the release or threatened release.

(2) The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance.

(3) The person accepts hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance which causes the incurrence of response costs.

We begin by noting that the sole factual averment the Landowners rely upon in its HSCA claim against Weavertown is that Weavertown hosed contaminated materials

into a watercourse. Weavertown asserts that its activities in conducting the clean-up it performed for DEP do not make Weavertown fall within any of the descriptions of a "responsible person" under Section 701, and therefore, it has no liability as a "responsible person." The Landowners, on the other hand, dispute Weavertown's position that it is not a "responsible person," asserting that Weavertown is an operator, transporter or arranger under Section 701. Even if the Court accepts as true that Weavertown, in conducting its activities for DEP caused some of the fly ash to be washed into a neighboring waterway, we would reject the claim that it was an "operator" under Section 701. As Weavertown points out, an operator is someone who operated or otherwise controlled activities at the site. Although Weavertown played a role in the clean-up activities, it had no ownership in or oversight for the area of the landslide before the incident. The Landowners suggest that the term "operate" should apply in a situation such as this where a non-owner-operator of an existing site, whose services are retained by DEP for the purpose of cleanup, allegedly creates an exacerbation of the site in the process of cleaning up the site. However, we believe that such a result would improperly stretch the intent of the General Assembly in seeking to impose liability on those parties that have created the hazard sought to be abated.

We also agree with Weavertown that the Landowners' transportation-theory of liability has no merit. The Landowners allege that Weavertown hosed fly ash in such a manner as to cause it to run into a tributary of the Monongahela River knowing that the fly ash would ultimately leach into neighborhood ground water. However, even if such action occurred, such as would impose liability under a negligence theory, we cannot conclude that the conduct constitutes the transportation of a hazardous material under the HSCA.

The Landowners also rely upon Section 702 of the HSCA for the proposition that the Act describes the scope of liability for response costs associated with the release of a hazardous substance. That Section provides:

A person or company who has entered into a contract with the department to assist the department in implementing this act ... shall not be held liable under this act for a release of a hazardous substance arising out of performing of a response action when the release is not caused by the contractor's negligence.

Based upon this provision, the Landowners assert that it has stated a claim against Weavertown because its allegations suggest that Weavertown, in its capacity as a DEP contractor assisting the department in its cleanup response acted negligently.

In response, Weavertown argues that Section 702 does not provide a separate ground for liability for entities that are deemed not to be "responsible persons" under Section 701. Weavertown asserts that the immunity for contractors established by the General Assembly in Section 702 applies only to such entities that also are "responsible persons." Thus, if a contractor working for the department is a responsible person, they will nevertheless be immune from suit under the HSCA unless they perform in a negligent manner. Weavertown's argument makes sense and we agree with this interpretation. Because the Landowners have pleaded no facts that might bring Weavertown within the description of a "responsible person," we also conclude that Section 702 does not, by implication, create a discrete foundation for liability under the HSCA. Accordingly, we will sustain this preliminary objection and dismiss count XII.

Weavertown next objects to the Landowners' claim in Count XVI which raises a

private nuisance claim. Weavertown notes that Pennsylvania common law defines a private nuisance as a "nontresspassory invasion of another's interest in the private use and enjoyment of the land." *Golen v. Union Corporation*, 718 A.2d 298, 301 (Pa.Super.1998). However, for the reasons expressed in our discussion above concerning MAWC, we reject this argument, and will overrule Weavertown's preliminary objection to Count XVI.

■■■ We next address Weavertown's objection to Count XVII of the Landowners' Complaint. Count XVII claims that Weavertown's conduct constituted a public nuisance. Weavertown demurs to this claim, asserting that, where a party is acting in compliance with the law, the party's conduct cannot constitute a public nuisance. *Chase v. Eldred Borough*, 902 A.2d 992 (Pa.Cmwlth.2006). Weavertown also relies upon a decision of our Supreme Court, *Borough of Collegeville v. Philadelphia Suburban Water Co.*, 377 Pa. 636, 105 A.2d 722 (1954) for the notion that, where a governmental entity has authorized a particular course of conduct, a court may not hold that party liable on public nuisance grounds. We agree with Weavertown that the conduct the Landowners allege does not constitute a public nuisance. The factual pleadings indicate that the Landowners seek to establish that Weavertown was acting pursuant to DEP's direction and authority. Based upon the above-cited authority, we conclude that the Landowners have failed to state a cause of action against Weavertown for creating a public nuisance and therefore, we sustain this refinery objection and dismiss Count XVII.

Weavertown also objects to the Landowners' request for medical monitoring un-der subparagraph "g" of the Prayer for Relief. Citing *Redland Soccer Club, Inc.*, Weavertown asserts that the Landowners have failed to allege the necessary elements that might entitle them to medical monitoring. However, for the reasons noted above in our discussion of *Redland* in addressing the preliminary objections of Allegheny Energy, we will overrule this objection.

Finally, Weavertown objects to the Landowners' request for damages for alleged diminution of property values. For the reasons we stated above in our discussion of Allegheny Energy's preliminary objection to the Landowners' request for such alleged loss, we agree with this objection and will strike the Landowners' claim against Weavertown for such damages. Accordingly, we sustain Weavertown's preliminary objections to Counts XII, XVII, and subparagraph "h."

### Conclusion

For the foregoing reasons, we will sustain the preliminary objections as follows: (1) Allegheny Energy's preliminary objections to Counts X, XVI, XVII, and paragraph "h" in the Landowners' prayer for relief, as it pertains to damages for alleged diminution of property values; (2) the Municipal Authority of Westmoreland County's preliminary objections to Counts XV and XVII; and (3) Weavertown Environmental Group's preliminary objections to Counts XII, XVII, and paragraph "h" of the Landowners' prayer for relief, as it pertain to damages for alleged diminution of property values. The parties' remaining preliminary objections are overruled.[7]

### ORDER

AND NOW, this 13th day of September 2007, we sustain the preliminary objections

---

7. We note, of course, that, with the exception of DEP and DOT, the responding parties did not file preliminary objections to every Count in the Complaint. Those Counts obviously remain a subject of this litigation.

of the respondents as follows: (1) Allegheny Energy's preliminary objections to Counts X, XVI, XVII, and paragraph "h" in the Landowners' prayer for relief, as it pertains to damages for alleged diminution of property values; (2) the Municipal Authority of Westmoreland County's preliminary objections to Counts XV and XVII; and (3) Weavertown Environmental Group's preliminary objections to Counts XII, XVII, and paragraph "h" of the Landowners' prayer for relief, as it pertain to damages for alleged diminution of property values. The parties' remaining preliminary objections are overruled.

We overrule the preliminary objections as follows: (1) Municipal Authority of Westmoreland County's preliminary objections to Counts III, VIII, XVI, and to the adequacy of the Landowners' pleading; (2) the Department of Environmental Protection and the Department of Transportations preliminary objections to Counts I, IV, VI, IX, XI, XIII, XVI, and XVII; (3) Weavertown Environmental Group's preliminary objections to paragraph "g" in the Landowners' prayer for relief, requesting medical monitoring costs.