COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL PROTECTION

v.

Douglas W. SPANGLER and Susan M. Spangler, Appellants.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 2014.

Decided Jan. 23, 2015.

---

Marc T. Valentine, Somerset, for appellants.

Greg Komain Venbrux, Pittsburgh, for appellee.

BEFORE: RENÉE COHN JUBELIRER, Judge, and PATRICIA A. McCULLOUGH, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY Judge McCULLOUGH.

Douglas W. Spangler and Susan M. Spangler (together, Appellants) appeal from the September 18, 2013 order of the Court of Common Pleas of Somerset County (trial court) granting the petition for rule to show cause filed by the Department of Environmental Protection (De-

partment) and permitting the Department to investigate, remediate, and clean up contamination on Appellants' property pursuant to the Hazardous Sites Cleanup Act (HSCA).[1] Having concluded that Appellants' assertions of error are either waived or lack merit, we affirm.

## Facts and Procedural History

Appellants are record owners of real property located in Jenner Township, Somerset County, where a farmhouse is situated and occupied by Appellant Douglas Spangler's mother (the Site). (Findings of Fact (F.F.) at 2–3.) On January 26, 2012, the Department's Emergency Response personnel, local firefighters, and the Somerset County Hazmat team responded to the Site after a cap to a steel 275–gallon home heating oil tank was mysteriously—and allegedly criminally—removed and its contents, approximately 150 gallons of home heating oil, released into the ground. (F.F. at 6, 8.) The responding agencies attempted to mitigate the damage caused by the spill, which travelled to a ditch in a road near a marshy area and a stream. (F.F. at 7, 9–10.) On January 27, 2012, a specialist investigated the Site on behalf of the Department and stated that the spill would need to be cleaned up immediately. (F.F. at 18–19.)

On January 30, 2012, the Department issued a compliance order to Appellants requiring them, within thirty days, to remove the contamination and stabilize the numerous heating oil tanks and plastic storage containers (collectively, the "Containers") on the property to prevent future releases. (F.F. at 25; Reproduced Record

(R.R.) at 222a–23a.) Appellants did not appeal this order. (Trial court op. at 3.)

Thereafter, the Department inspected the Site and monitored the conditions on the property, observing that Appellants failed to clean up the contaminated soil or secure the Containers. In September 2012, Appellants signed an agreement that granted the Department access to part of their property and summarized the Department's proposal to remove visibly contaminated soil and any deteriorating Containers. Pursuant to the agreement, the Department collected samples from the Containers, surface water, and soil, and sent them to a lab to be tested; analytical reports revealed that the aqueous layer of the composited containerized liquids contained levels of zinc, benzene, and methyl ethyl ketones. Appellants later rescinded the agreement, and the Department continued to monitor the Site from public roads, discovering that Appellants failed to clean up the contamination or stabilize the Containers. (R.R. at 145a, 162a–72a, 225a, 234a–35a, 307a–11a.)

On August 30, 2012, the Department filed a petition to show cause, requesting the trial court to issue a rule regarding why the Department should not have access to the Site under sections 501 and 503 of the HSCA, 35 P.S. §§ 6020.501, 503.[2] The trial court issued the rule on September 5, 2012, and Appellants filed an answer on January 22, 2013.

On April 2, 2013, the trial court held a hearing, after which it made the following relevant findings of fact in an order and opinion dated September 18, 2013:

---

1. Act of October 18, 1988, P.L. 756, 35 P.S. §§ 6020.101–6020.1305.

2. In general, section 501 of the HSCA grants authority to the Department or a property owner to investigate and take responsive action when certain conditions are present on

the property. Among other things, section 503 of the HSCA vests the Department with the power to issue orders or seek court approval to ascertain whether responsive action is needed and/or to take responsive action if necessary.

4. [Appellants] have stored large quantities of hazardous and non-hazardous substances at the Site, including at least fifty (50) steel 275–gallon home heating oil tanks, most of which are filled or partially filled with heating oil, gasoline, or a mixture of heating oil and water. The Site also contains over fifty (50) plastic storage containers/totes containing gasoline; numerous plastic trash cans partially filled with oil; as well as drums and other containers containing oil or gasoline (collectively, "Containers"). The Department estimates there are in excess of 12,000 gallons of heating oil and 300 gallons of gasoline stored at the Site.

5. Most of the steel tanks are laying on the ground, exposed to the elements, and show signs of deterioration by rust.

\* \* \*

13. Some level of contaminated soil remains on the private property at the Site of the release.

14. The release of oil and/or gasoline at the Site poses a threat of contamination to [Appellants'] water supply.

15. Many of the Containers are in poor condition, are rusted, brittle, and have holes or cracks. There is reason to believe that the Containers will continue to deteriorate and could result in additional releases of oil and/or gasoline if conditions on the Site are not appropriately addressed.

16. Because some of the Containers are unsealed or are in poor condition, they also pose a threat of fire or explosion.

17. The Site does not have any barrier fencing to prevent persons from entering the site and becoming exposed to the contamination, or otherwise conduct acts of vandalism which could result in massive contamination of water supplies and waterways.

\* \* \*

20. In addition to the home heating fuel oil tanks (approximately 50) there were numerous (approximately 20) blue plastic 7 gallon containers labeled "Aqua–Tainer" stored on the ground in an unsecured area around the tanks. The blue containers were observed to contain gasoline.

21. Some of the fuel tanks had exposed open holes, without threaded caps, which were used to fill the tanks and which holes could potentially be the source of leakage and discharge onto the ground.

22. Some of the oil tanks were lying in stagnant water. Such tanks are susceptible to rusting out and subsequent leakage.

23. The fuel in the tanks was estimated at 12,000 gallons of heating fuel and approximately 300 gallons of gasoline in the blue containers.

\* \* \*

43. The method proposed by the Department would be to empty and remove dangerous tanks and containers and thereafter to excavate sufficient soil for disposal, leaving only soil suitable to remain.

44. [Appellant Douglas Spangler] has worked for more than 30 years hauling and delivering fuel and petroleum products as an employee-driver of home heating oil companies in Somerset County.

45. [Appellant Douglas Spangler] would indicate that over the years of his employment he has delivered petroleum products to sites where the tanks are rusty and laying in contact with the ground.

46. [Appellant Douglas Spangler] believes that the fuel tank which allowed

the discharge of fuel had been released by someone pursuant to a criminal act. (F.F. at 4–5, 13–17, 20–23, 43–46.)

On September 18, 2013, the trial court granted the Department's petition and permitted the Department to investigate, remediate, and clean up the oil and gasoline contamination at the Site. (Order, 9/18/2013.) After Appellants filed a notice of appeal, the trial court ordered them to file a Pa.R.A.P. 1925(b) statement, and, when they did,[3] the trial court issued a Pa.R.A.P. 1925(a) opinion.

## Discussion

### The Tank Act and the HSCA

■ On appeal to this Court, Appellants first argue that the trial court erred in applying section 503 of the HSCA because the Containers are filled with home heating oil and are exempt from regulation under the Storage Tank and Spill Prevention Act of 1989 (the Tank Act).[4] More specifically, Appellants contend that their home heating oil storage tanks meet the exception from the definition of an aboveground storage tank under section 103 of the Tank Act, 35 P.S. § 6021.103, because the Containers are used to store heating oil for consumptive use and, consequently, the HSCA does not apply. We find no merit to this argument.

Section 103 of the Tank Act, entitled "Definitions," states in pertinent part as follows:

"ABOVEGROUND STORAGE TANK." Any one or combination of stationary tanks with a capacity in excess of 250 gallons, including underground pipes and dispensing systems connected thereto within the emergency containment area, which is or was used to contain an accumulation of regulated substances, and the volume of which, including the volume of all piping within the storage tank facility, is greater than 90% above the surface of the ground. The term includes any tank which can be visually inspected, from the exterior, in an underground area. **The term shall not include any of the following:**

\*　　\*　　\*

**(2) A tank used for storing heating oil for consumptive use on the premises where stored.**

35 P.S. § 6021.103 (emphasis added). Under section 1311(a) of the Tank Act, "a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence, or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution." 35 P.S. § 6021.1311(a).

The purpose of the Tank Act is to prevent the occurrence of storage tank releas-

---

**3.** Appellants' Pa.R.A.P. 1925(b) statement reads:

　1. The Court erred in determining that the various storage tanks on [Appellants'] site are not exempted under the Storage Tank and Spill Prevention Act, 35 P.S. section 6021.101, et. seq. The Court determined that the Act did not apply.
　2. The Court erred in determining that the Department had a reasonable basis to believe that the storage tanks pose a threat of release.

　3. The Court erred in determining that the storage tanks on [Appellants'] site are not Aboveground Storage Tanks under 35 P.S. section 6021.103.
　4. The Court erred in determining that [Appellants] could not properly remediate the site.
(Pa.R.A.P. 1925(b) statement, 12/30/2013.)

**4.** Act of July 6, 1989, P.L. 169, *as amended*, 35 P.S. §§ 6021.101–6021.2104.

es "through the establishment of a regulatory scheme for the storage of regulated substances in new and existing storage tanks and to provide liability for damages sustained within this Commonwealth as a result of a release and to require prompt cleanup and removal of such pollution and released regulated substance." Section 102(b) of the Tank Act, 35 P.S. § 6021.102(b). The Storage Tank Indemnification Fund provides funds "for the purpose of making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks and for making loans to owners as authorized by [the] [Tank Act]." Section 704(a)(1) of the Tank Act, 35 P.S. § 6021.704(a)(1). In return for the payment of delineated tank fees, the Fund provides coverage to storage tank owners to clean up storage tank releases that pose a significant health risk to the general public. *M.H. Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Board,* 789 A.2d 398, 403 (Pa.Cmwlth.2001).

Even accepting as true Appellants' argument that their Containers meet the exclusion for consumptive heating oil and do not fall within the ambit of the Tank Act, this merely proves that the Tank Act is inapplicable.

However, the HSCA remains applicable, and there is nothing in the Tank Act to suggest a co-dependency between the two statutes. Nor is there any language to support the conclusion that the HSCA applies only when the Tank Act is applicable, or, conversely, that regulatory exclusion from the Tank Act results in regulatory exclusion from the HSCA. Rather, the two statutes set forth separate, independent

schemes, and the Department can exercise its authority under section 503 of the HSCA when the Tank Act does not apply. *See* section 1312 of the Tank Act, 35 P.S. § 6021.1312 ("It is hereby declared to be the purpose of this act to provide additional and cumulative remedies to prevent and abate the pollution caused by storage tanks, and **nothing contained in this act shall in any way** abridge or alter rights of action or remedies now or hereafter existing in ... statutory law, criminal or civil, nor shall any provision in this act ... **be construed as estopping the Commonwealth ... from proceeding in courts of law or equity to** abate any pollution now or hereafter existing, or **enforce ... statutory rights.**") (emphasis added); section 104 of the HSCA, 35 P.S. § 6020.104 (stating that the HSCA "**shall not be construed to affect, impair or repeal any provision of any other statute.**") (emphasis added). *See also UMCO Energy, Inc. v. Department of Environmental Protection,* 938 A.2d 530, 535–36 (Pa.Cmwlth. 2007) (concluding that statutory regulatory scheme did not supersede the Department's authority under another statutory regulatory scheme where the language in the first statute "preserves the statutory protections" of the second statute). Therefore, even assuming that Appellants are exempt from the Tank Act, we conclude that the Commonwealth nonetheless retains the power to seek and exercise its statutory authority under the HSCA.

### A "responsible person" under the HSCA

■ Appellants also contend that they do not meet the definition of a "responsible person" under section 701(b)(2) of the HSCA,[5] and, thus, they should not have to comply with the HSCA. However, Appellants did not raise this argument before the trial court or in their Pa.R.A.P. 1925(b)

---

**5.** In relevant part, section 701 of the HSCA states:

statement, *see supra* n. 3; therefore, it is waived. Pa.R.A.P. 302(a) (stating that issues not raised in the lower court are waived and cannot be raised for the first time on appeal); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement ... are waived.").[6]

## A "hazardous substance" under the HSCA

6020.701. Responsible person
(a) GENERAL RULE.—Except for releases of hazardous substances expressly and specifically approved under a valid Federal or State permit, a person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:
(1) The person owns or operates the site:
(i) when a hazardous substance is placed or comes to be located in or on a site;
(ii) when a hazardous substance is located in or on the site, but before it is released; or
(iii) during the time of the release or threatened release.

       *     *     *

(b) EXCEPTIONS.—

       *     *     *

(2) **Liability** under subsection (a) **shall not apply to an owner of real property if the real property is exclusively used as single– or multi-family housing of four units or less** or for private noncommercial recreational purposes, **and** the owner did not place the hazardous substance on the property, or **the owner did not know and had no reason to know that a hazardous substance which is the subject of the release or threatened release was disposed on, in or at the site.**
35 P.S. § 6020.701(a), (b)(2) (emphasis added).

6. Even if the issue were not waived, we note that the concept of a "responsible person" in section 701 of the HSCA is used to designate the liable people and/or entities that the Department may recover costs from when the Department cleans up hazardous substances and incurs expenses. Section 507(a) of the

■ Next, Appellants argue that their Containers possess home heating oil and gasoline (petroleum products) and are not "hazardous substances" under the "petroleum exclusion" in section 103(2) of the HSCA.[7] Again, however, Appellants waived this argument because they did not assert it in their Pa.R.A.P. 1925(b) statement, *see supra* n. 3. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement ... are waived.").[8]

HSCA, 35 P.S. § 6020.507(a) ("A responsible person under section 701 ... shall be liable for the response costs"), *accord* 26 P.L.E. Health and Environment § 117 ("A responsible person ... under the [HSCA] is liable for the response costs and for damages to natural resources."). *See Diess v. Department of Transportation*, 935 A.2d 895, 914 (Pa. Cmwlth.2007). *See also* section 703(a) of the HSCA, 35 P.S. § 6020.703(a) (listing affirmative defenses to liability).

Here, because the Department is not instituting an action to recover remediation costs, the issue of whether Appellants are responsible persons is irrelevant to these proceedings and the relief granted. Indeed, sections 501 or 503 of the HSCA do not require a finding that one is a responsible person before the Department can be granted investigative or remediative authority pursuant to those sections. Accordingly, it appears Appellants can raise their argument when or if the Department seeks to hold them liable as a "responsible person" in a later equitable action. *See* section 507(a) of the HSCA ("The department, a Commonwealth agency, or a municipality which undertakes to abate a public nuisance under this act or take a response action may recover those response costs and natural resource damages in an action in equity brought before a court of competent jurisdiction.").

7. In defining "hazardous substance," section 103(2) of the HSCA states as an exception: "The term [*i.e.* hazardous substance] does not include petroleum or petroleum products, including crude oil or any fraction thereof, which are not otherwise specifically listed or designated as a hazardous substance under paragraph (1)...."

### "Release and threat of a release" under the HSCA

Appellants further assert that the evidence failed to demonstrate that the Containers are currently leaking or are likely to release their contents in the near future.

In pertinent part, section 503(f) of the HSCA provides:

6020.503. Information gathering and access

\*   \*   \*

(f) REMEDIES.—

(1) In addition to any other remedy provided by this act, the department may enforce the provisions of this section by issuing orders requiring access to information, requiring entry onto property and restraining interference with any response action. An order issued under this section may be appealed to the board under the act of July 13, 1988 (P.L. 530, No. 94), known as the Environmental Hearing Board Act.

\*   \*   \*

(3) In lieu of issuing an order under paragraph (1), the department may apply immediately to a court of competent jurisdiction for the same relief.

8. Despite the exemption for petroleum products in section 103(2) of the HSCA, section 103 of HSCA includes in the definition of hazardous substances those substances designated as hazardous pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675, which, in turn, and through regulations promulgated by the Environmental Protection Agency, lists methyl ethyl ketone, zinc, benzene and other elements. 35 P.S. § 6020.103(1)(2); 42 U.S.C. § 9602(a); 40 C.F.R. § 302.4. Courts have held that the petroleum exclusion does not apply where petroleum-based compounds have been adulterated with a hazardous substance. *See, e.g., United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 266 (3d Cir.1992) ("[T]he 'exclusionary' provision [*i.e.,* the exception for petroleum products] does not warrant the inclusion of oil which has become contaminated with hazardous substances through use"), *accord Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.,* 240 F.3d 534, 541 (6th Cir.2001) ("[P]etroleum products mixed with hazardous substances [that are] not constituent elements of petroleum are hazardous substances."); *Mid Valley Bank v. North Valley Bank,* 764 F.Supp. 1377, 1385 (E.D.Cal.1991) ("If the lead results from its use as an additive to petroleum products, and was found at the level expected of purely petroleum additives, it would fall under the petroleum exclusion and would not be a 'hazardous substance' ... If, on the other hand, the level exceeded the amount that would have occurred in petroleum during the refining process, then the petroleum exclusion would not apply."). *See also Two Rivers Terminal, LP v. Chevron USA, Inc.,* 96 F.Supp.2d 432, 443 (M.D.Pa.2000) (noting that the HSCA's exclusion for petroleum products is modeled after the provision in an analogous federal statute, CERCLA, and stating that courts will often follow CERCLA in interpreting the HSCA).

Here, the Department's analytical reports indicate that samples taken from Appellants' property contain levels of zinc, benzene, and methyl ethyl ketones, (R.R. at 307a–11a) and, while the trial court did not issue any findings on these reports, they may be enough to demonstrate that the Department had a "reasonable basis to believe that there may be a release or a threat of a release of a hazardous substance." 35 P.S. § 6020.503(f)(4)(i). In any event, although Appellants have waived their hazardous substance argument for purposes of this appeal, we note that if the Department seeks to hold Appellants liable as responsible persons, the Department must establish, among other things, the release or threatened release of a "hazardous substance." 26 P.L.E. Health and Environment § 117 ("There are four operative facts that must be proven before the [Department] may recover response costs incurred in the cleanup of hazardous waste: (1) there may be a release or threatened release (2) of a hazardous substance (3) from a site, and (4) there is a person responsible."), *accord Andritz Sprout–Bauer v. Beazer East,* 12 F.Supp.2d 391, 407 (M.D.Pa.1998).

(4) **When** the board reviews an order issued under paragraph (1), or when **a court reviews the department's request for immediate relief** under paragraph (3), the board shall uphold the department's order and **the court shall grant the requested relief where all of the following are established:**

**(i) The department has a reasonable basis to believe that there may be a release or a threat of a release of a hazardous substance or contaminant.**

(ii) The order or relief requested is reasonably related to determining the need for a response, to choosing or taking any response or to otherwise enforcing the provisions of this act.

35 P.S. § 6020.503(f) (emphasis added).

Pursuant to section 503(f)(4)(i) of the HSCA, the Department has the burden to prove that it "has a reasonable basis to believe that there may be a release or a threat of a release of a hazardous substance or contaminant." 35 P.S. § 6020.503(f)(4)(i).

■ Here, the trial court's findings concerning the potential and imminent release of the contents of the Containers are supported by substantial evidence, namely testimonial and documentary proof that the Containers are deteriorated and appear to be on the verge of discharging fluids. More specifically, the Department's expert testified that many of the lids on the Containers containing gasoline were not "secure;" that "a lot of" these Containers appeared "brittle;" and that some of them have "holes." According to the expert, all of these features make it likely that the Containers containing gasoline will leak or spill. The Department's expert further testified that the Containers containing home heating oil were in "poor condition" and that most of them displayed "a lot of corrosion" and "holes," thereby jeopardizing the "integrity" of the tanks and mak-

ing it likely that they will "leak or break open." The expert's testimony was corroborated with photographic evidence depicting the deteriorated state and condition of the Containers. (R.R. at 131a–34a, 150a, 171a, 176a–78a, 229a–30a).

Moreover, the record supports not just the "threat of release" of a hazardous substance, but that an actual "release" of a hazardous substance has occurred on the Site. The Department introduced photographs depicting two steel tanks leaking oil into the ground and a steel tank releasing oil onto the surface water and ground near another tank. When directed to these photographs, the Department's expert confirmed that these Containers are broken and are "leaking the fuel oil" into the ground. (R.R. at 149a–51a, 229a–30a.) Therefore, the Department's evidence was sufficient to establish that the Department had a reasonable basis to believe that there was a threat of release or release of a hazardous substance, and Appellants' argument does not merit relief.

### Appellants' ability to clean up the Site

■ Finally, Appellants argue that they could have cleaned up the Site themselves and that they have both the financial ability and physical wherewithal to do so.

In pertinent part, section 501 of the HSCA states:

6020.501. Response authorities

(a) GENERAL RULE.—**Where there is a** release or substantial threat of release of a contaminant which presents a substantial danger to the public health or safety or the environment or where there is a **release or threat of a release of a hazardous substance, the department shall investigate and, if further response action is deemed appropriate, the department** shall notify the owner, operator or any other responsible

person of such release or threat of a release if such persons are known and **may allow such person or persons to investigate and undertake an appropriate response, or may undertake any further investigation, interim response or remedial response relating to the contaminant or hazardous substance which the department deems necessary or appropriate to protect the public health, safety or welfare or the environment.**
(b) EFFECT ON LIABILITY.—No response action taken by any person shall be construed as an admission of liability for a release or threatened release.

\* \* \*

(d) INVESTIGATIONS.—**The department shall undertake or cause to be undertaken by the owner,** operator or any other responsible person as permitted under subsection (a), **investigations, monitoring, surveys, testing and other similar activities necessary or appropriate to identify the existence and extent of the release or threat of release, the source and nature of the hazardous substances or contaminants and the extent of danger to the public health or welfare or the environment.** The department may also undertake planning, legal, fiscal, economic, engineering, architectural and other studies or investigations necessary or appropriate to plan and direct a response action, to recover the costs of the response action and to enforce the provisions of this act.

35 P.S. § 6020.501(a)-(b), (d) (emphasis added).

In the opinion accompanying its September 18, 2013 order, the trial court found: "The record is clear that the Department has given every opportunity to [Appellants] to exercise some meaningful self-help remediation. . . . The only action taken by [Appellants], as indicated in our findings, was to stabilize some of the tanks by placing caps on open holes. The Site continues to be, in the expert opinion of the Department witness, a highly likely source of future contamination if action is not taken promptly." (R.R. at 323a–24a.)

In its Pa.R.A.P. 1925(a) opinion, the trial court found that although Appellants testified that they could clean up the Site themselves, the Department's expert's testimony detailed the procedures necessary to effectuate a remediation in compliance with regulatory standards and Appellants' expressed lack of familiarity with the process. Accordingly, the trial court found it reasonable to conclude that the remediation was beyond Appellants' abilities. (Trial court op. at 3–4.)

We agree with the trial court's analysis, which is fully supported by the record. On January 30, 2012, the Department issued a compliance order to Appellants and gave them thirty days to clean up the Site. Appellants failed to do so, and the Department filed the current petition in August 2012. At the hearing, the Department's expert testified that the Site has not been remediated and that one of the preferred methods of remediating the soil, a process called bioremediation, initially involves taking a series of soil samples with a geo probe and having the samples tested. According to the Department's expert, these samples are used to ascertain the extent of the contamination and to gauge the amount of nutrients, enzymes, and/or bacteria that will be needed to decompose and breakdown the contamination and subsequent soil samples will confirm any progress made through the use of nutrients, enzymes, and/or bacteria. (R.R. at 171a–77a.) Appellants, however, admitted that they lack training with taking soil samples and do not possess the knowledge to interpret the results of chemical analysis.

(R.R. at 198a–200a.) Given this record, we discern no abuse of discretion or error of law on the part of the trial court in finding that Appellants' lack the ability to clean up the Site.

Moreover, our conclusion is buttressed by the fact that the Department has discretion, under sections 501(a) and (d) of the HSCA, to allow designated persons to perform investigation and/or remediation measures or to perform these undertakings itself. Our conclusion is further bolstered by the expressed, legislative intent of the HSCA stated in section 102(9) and (12)(vii); these provisions declare that "[e]xtraordinary enforcement remedies and procedures are necessary and appropriate ... to deter persons in possession of hazardous substances from careless or haphazard management," 35 P.S. § 6020.102(9), and to provide the Department with "flexible and effective means" to enforce the HSCA and investigate and remediate the threatened release or release of hazardous substances. 35 P.S. § 6020.102(12)(vii).

### Conclusion

Because Appellants' assertions of error are either waived or lack merit, we conclude that the trial court did not err in granting the Department's petition for rule to show cause and permitting the Department to investigate, remediate, and clean up contamination on Appellants' property pursuant to the HSCA. We note that during oral argument, the Department represented that consistent with sections 501 and 503 of the HSCA, it will first conduct investigative sample testing of the Site before taking any response or remediation measures.

For the foregoing reasons, we affirm.

### ORDER

AND NOW, this 23rd day of January, 2015, the September 18, 2013 order of the Court of Common Pleas of Somerset County is affirmed.