IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Elizabeth Borough | : | |
| | : | |
| v. | : | No. 871 C.D. 2025 |
| | : | |
| Kenneth A. Kolodziej and | : | |
| Lori A. Kolodziej, | : | Argued: March 3, 2026 |
| Appellants | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE STELLA M. TSAI, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE McCULLOUGH                    FILED: April 2, 2026

Kenneth A. Kolodziej and Lori A. Kolodziej (Appellants) appeal from the June 10, 2025 order of the Court of Common Pleas of Allegheny County (trial court), granting the Petition for Emergency Demolition (Emergency Petition) filed by Elizabeth Borough (Borough), authorizing the demolition of the structure on Appellants' real property located at 113 South Second Avenue, Elizabeth, Pennsylvania, and imposing a lien on the property for the cost of razing and demolishing the structure, removing all debris, and grading the property. Upon review, we affirm.

## I.   Factual and Procedural Background

The vacant two-story commercial structure at issue is located on South Second Street in downtown Elizabeth, which is heavily travelled by pedestrians and vehicles. Its construction consists of a brick masonry façade, wood-framed floors, and a metal roof. The structure shares common side walls with two adjacent buildings.

On June 3, 2025, the front façade of the structure partially collapsed onto the sidewalk and into South Second Street. That same day, the Borough's structural engineer, Laura. R. Branthoover, P.E., of Glenn Engineering, reviewed the site of the collapse and initially determined the building was in imminent danger of further failure or collapse and presented a public safety hazard. (Reproduced Record (R.R.) at 12a.) The Borough's Building and Code Officer, Robert Vitous, also inspected the property on that day. He issued an Inspection Report, documenting the following visual findings and report on the building structure:

> Brick Veneer Pulled away from the structure and fell from the building. This was about ¼ of the brick veneer directly above the entry facade. The failing of this brick facade further created compromises of the structural integrity of the building. Emergency Demolition work was needed to remediate the potential full collapse of the front facade.
>
> Upon visual inspection from the rear entry of the structure, there appears to be no true interior side walls by design. The side walls are the exterior of both neighboring structures. Pilasters have been integrated into those side walls and appear to be supporting the I-beams and cross beams.
>
> There are no floors within the ground level with exposed basement areas with no safety measures intact.
>
> Area is full of debris and dangerous hazards[.]
>
> The interior framework, walls, knee walls, etc. is incomplete, and the existing framing appears to be incorrect in places throughout.
>
> Severe water and fire damage is noted throughout the structure[.]
>
> Existing original plumbing is exposed and unfinished[.]

Existing Framing work, including interior walls, roof rafter system, supporting knee walls, headers, etc. [a]ppear to be substandard and do not meet current code standards.

A temporary electrical panel is on for this structure. No other electrical work exists throughout.

No HVAC or mechanical entities exist in the structure.

Metal Roofing system is incomplete with panels missing and edge flashing not completed alongside walls and step downs.

The full building structure, interior, and exterior appear to be beyond repair at this juncture.

The building is not secure and properly blocked off to the public. The rotting plywood door is located at the rear entry with a hasp lock. The front entry is open with no door or framed wall enclosing the structure. The front entry store front only has free standing, moveable rotting plywood structures, which are placed in front of the building entrance.

(R.R. at 50a-51a.) South Second Street was blocked indefinitely and all businesses on that block were notified that they could not open due to the danger to the public.

On June 4, 2025, Ms. Branthoover completed an engineering assessment report (Engineering Report), recommending that demolition of the structure was necessary to minimize the risk of imminent danger for the following reasons:

- Partial collapse of the front masonry wall facing South Second Street.

- Displacement of brick columns and loss of support.

- The building's front masonry wall has partially collapsed, exposing the interior structure to the elements and creating an active hazard along the public right-of-way.

3

- The collapse has potentially compromised the structural integrity of the building and introduced an active fall hazard to adjacent sidewalks and traffic areas.

- The front wood wall was removed, and it became apparent that the structural beam is out of plumb and experiencing structural distress.

- Severe interior water and fire damage from prolonged roof leakage leading to rot and deterioration of wooden joists.

- Potential sagging or partial collapse of second floor joists.

- Second story floors unsafe for entry or load-bearing.

- Structure is completely lacking bottom floor joists - entire first floor has failed.

- The second floor is deteriorated with areas open to the floor below.

- Cracking and displacement in basement/foundation walls.

- Possible undermining or erosion at footing level due to poor drainage.

- Roof framing has failed or is in imminent danger of collapse; daylight visible through upper wall voids and roof structure.

- Apparent modifications to horizontal framing members causing potential decrease in strength.

(R.R. at 16a-17a.)

4

Ms. Branthoover concluded that the property was in violation of numerous provisions of the 2021 International Property Maintenance Code (IPMC), which is followed by the Borough.[1]

Appellants engaged James R. Ventura, P.E., of AWK Consulting Engineers, Inc., on June 4, 2025, to provide an evaluation of the structure. Mr. Ventura concluded that the building did not pose an imminent threat to the safety of the public. Mr. Ventura prepared a report, concluding that the "recent collapse of the brick in the front face of the second-floor exterior wall is only limited to the exterior wall at the front (north) face of the building and does not impact the structural integrity of the

[1] The Engineering Report described violations of: Section 111 of the IPMC, (Unsafe Structures) due to an unstable foundation from cracking and displacement in basement/foundation walls; possible undermining or erosion at footing level due to poor drainage; partial collapse already occurred; Section 111.1.5 (Dangerous Structure or Premises) as part of the structure had been damaged by fire; roof and floor failures such as roof framing has failed or is in imminent danger of collapse; daylight is visible through upper wall voids and roof structure; Section 301.2 (Responsibility) as Appellants have not maintained the structure and exterior property in compliance; Section 301.3 (Vacant Structures and Land), as the structure was not maintained and has caused a blighting problem that can adversely affect the public health or safety; Section 304 (Exterior Structure) due to property visibly in a dilapidated state; property partially collapsed onto the sidewalk in the front of structure and into the street; second floor exterior front wall is lacking the structural support necessary to carry the dead weight; second floor exterior wall visibly out of plumb and exposed lumber shows significant damage; the structural elements of the roofing system and the exterior walls have failed; Section 304.1.1 (Unsafe Conditions) due to exterior front wall failure; collapse of front façade; environmental factors have severely weakened the structure's ability to support vital flooring, roofing, and framing systems; the exterior wall failure caused the partial collapse; Section 304.2 (Protective Treatment) due to exterior surfaces not being maintained in good condition; Section 304.7 (Roofs and Drainage) as roof system failed; a hole in the roof allowed weather factors to cause structural damage to exterior walls and other critical framing systems to be compromised; Section 304.13 (Window, Skylight and Door Frames) as front entry doors are missing due to collapse and is open to the public; windows are not weather tight, missing facade or proper siding protection exposed the interior structure to rain, etc.; Section 305.1 (Interior Structure) as interior structure is in a deplorable state; existence of water from the failed roof has penetrated many areas and presents a real collapse hazard; structural steel beams have failed due to continuous exposure to rain and of design of load distribution; Section 111.2 (Closing of Vacant Structures) as structure has been vacant and unfit for human habitation and occupancy and is in danger of further collapse. (R.R. at 18a-23a.)

entire structure." (R.R. at 47a.) To thwart imminent collapse, Mr. Ventura recommended the placement of a temporary support on the roof framing, removal of the deteriorated second floor exterior wall, and replacement of the front (north) face of the building. *Id.* at 48a.

The Borough's Engineer, Ms. Branthoover, received and reviewed Mr. Ventura's report and then conducted a subsequent site review on June 5, 2025, and amended her Engineering Report to address the findings and recommendations of Mr. Ventura.

In the meantime, Appellants installed a temporary roof support beam and post system while the repairs recommended by Mr. Ventura were being made to the front façade.

On June 6, 2025, the Borough filed the Emergency Petition in the trial court. The Emergency Petition alleged that the building was structurally unsound and was creating an imminent danger to the health and safety of the public. The Emergency Petition described the structural deficiencies as including: the collapse of the front façade, severe rot and deterioration of the wooden joists, partial collapse of second-floor joists, cracking and displacement in the basement and foundation walls, complete lack of bottom floor joists, and imminent collapse of the roof framing. (R.R. at 5a.) The Emergency Petition sought an order granting the Borough permission to demolish the building and lien the property for the costs of doing so. On June 9, 2025, Appellants hired a second structural engineer to provide an opinion as to the structural integrity of the building. The trial court held a hearing on June 10, 2025. Appellants' counsel indicated to the trial court that they were unable to secure the attendance of their two structural engineers on three days' notice. However, counsel did not expressly request a continuance of the hearing.

6

The Borough's structural engineer, Ms. Branthoover, testified that the front of the building was not supported correctly by the brick columns beneath it because the bricks were severely deteriorated. Using 23 photographs taken on June 3 and 5, 2025, of the interior and exterior of the building as reference,[2] she described how the front I-beam was out of plumb and had started to fail and fall forward, and the wall was not resting on the middle of the I-beam, but was resting on the edge of the top part of the I-beam, known as the flange. (R.R. at 91a-92a.) She explained that a wall cannot rest on the flange because the I-beam will fail. Turning next to the roof and floor failures, Ms. Branthoover indicated that she saw daylight from the inside of the building, and that the interior of the building had been exposed to the elements for years. *Id.* at 92a. She indicated that there was no first floor, and the second floor was severely deteriorated. She further explained that the beams were not structurally sound to support the second floor. She reported that one of beams was cut and rendered useless because cut beams do not operate the same with holes in the middle of them. *Id.* In her opinion, that compromised the structure. With regard to the foundation and load bearing walls, Ms. Branthoover explained that there was cracking and missing concrete block in the foundation.

Ms. Branthoover was asked whether she agreed with Mr. Ventura's findings regarding the structural integrity of the building and his recommendations to make the building safe. She did agree with his finding that the second-floor framing was significantly bent outward and exhibited extensive timber deterioration. *Id.* at 95a-96a. However, she did not agree with Mr. Ventura's finding that the exposed support beams and columns along the first and second floors were plumb and exhibited no

---

[2] The 11 photographs taken on June 3, 2025, are on pages 25a-33a of the Reproduced Record. Twelve additional photographs taken on June 5, 2025, of the interior, exterior and rooftop (by use of a drone) are on pages 35a-45a.

visual signs of structural distress. *Id.* She also disagreed with Mr. Ventura's recommendations that providing temporary support of the roof framing, removing the deteriorated second floor, and replacing the front of the building would alleviate the issues she identified in her Engineering Report. In her opinion, even if Appellants followed those recommendations, the building was still in imminent danger of collapse. *Id.* at 97a.

Borough Manager, Scott Craighead, testified that Appellants had successfully appealed a demolition order in 2015, and that nothing had been done on the building since that time. (R.R. at 110a.) In the three years that Mr. Craighead was Borough Manager, Appellants did not apply for building permits. He never saw engineered plans or architectural plans for the building, or Appellants actively engaged in any kind of remediations or repairs of the building. *Id.* at 112a.

The Borough's Building and Code Officer, Mr. Vitous, testified that he previously sent letters to Appellants in March of 2025 citing façade violations. *Id.* at 118a-19a. After the façade collapse, he personally observed bowing of the front wall, an incomplete roof, old fire damage, extreme water damage, absence of floors, and an open foundation. *Id.* at 123a. It was his opinion that the building's structure, both interior and exterior, were beyond repair at that juncture. *Id.* at 51a.

Appellant, Kenneth Kolodziej, testified that he is a building contractor who purchased the building in 2005, with the intention of fixing it up and renting it. He is not an engineer. In the twenty years since he owned the building, he removed two-thirds of the roof, totally gutted it, and ripped out the whole first floor. *Id.* at 138a. He said that, after the collapse of the façade on June 3, 2025, at the recommendation of Mr. Ventura, he provided temporary support of the roof framing, removed the deteriorated second floor, and replaced the front wall with vinyl siding. *Id.* at 148a,

150a. He believed that, with those corrective measures, the building was not in imminent danger of collapsing.

Upon conclusion of the hearing, the trial court entered an order declaring the structure a nuisance, ordering the immediate demolition of the building, and ordering that a lien be placed on the property for the costs related thereto. The trial court credited the testimony of Ms. Branthoover and Mr. Vitous that the building was in imminent danger of collapse. On June 12, 2025, Appellants presented an Emergency Motion for Reconsideration, which the trial court denied. Appellants now appeal.

## II. Issues[3]

Appellants raise five issues, which we have condensed into three: (1) whether they were denied due process of law because they were not afforded adequate notice and a meaningful right to be heard; (2) whether substantial evidence supported the trial court's determination that the building was a nuisance and posed an imminent danger requiring demolition; and (3) whether the trial court erred in admitting the testimony and report of the Borough's Structural Engineer, Ms. Branthoover.

## III. Analysis

### 1. *Violation of Procedural Due Process – Whether the Trial Court Erred in Failing to Grant a Continuance Sua Sponte*

Appellants first argue that they were deprived of due process because they were not provided with sufficient notice of the hearing on the Emergency Petition or a meaningful opportunity to be heard. They allege that they received the Emergency Petition on Saturday, June 7, 2025, one business day prior to the hearing (held on

---

[3] Generally, "[o]ur scope [and standard] of review in an equity action is limited to the determination of whether the [trial court's] findings of fact are supported by substantial evidence, whether an error of law has been made, or whether the [trial court] abused [its] discretion." *King v. Township of Leacock*, 552 A.2d 741, 743 (Pa. Cmwlth. 1989).

9

Tuesday, June 10, 2025).[4] While they were able to engage two experts to prepare reports, prior commitments prevented these experts from attending the hearing. Appellants contend that, **although their counsel did not expressly ask the trial court for a continuance**, it was clear from the totality of the circumstances involved that they would not receive a fair hearing without an opportunity for their experts to testify. Appellants argue the trial court abused its discretion in not acting *sua sponte* to continue the hearing once it learned that Appellants' experts were not available to testify on the day of the hearing. The trial court's failure to continue the hearing, in Appellants' view, deprived them of procedural due process. For the following reasons, we disagree.

First, we are unaware of any Pennsylvania caselaw that imposes a *sua sponte* obligation on trial courts to continue proceedings when expert witnesses become unavailable, and Appellants have pointed us to none. To the contrary, Pennsylvania Rule of Civil Procedure (Pa.R.C.P.) 216 (Grounds for Continuance), requires that a formal request for a continuance from a party is required. Pa.R.C.P. 216 specifies the acceptable grounds for a continuance request and the manner in which it should be presented to the trial court. For example, an application for a continuance may be granted if such continuance has been agreed to by all parties, Pa.R.Civ.P. 216(A)(1); because of illness on the part of a counsel of record, a material witness, or a party, Pa.R.Civ.P. 216(A)(2); inability to subpoena or take testimony by any material witness, Pa.R.Civ.P. 216(A)(3); and other special grounds as may be allowed in the discretion of the trial court, Pa.R.Civ.P. 216(A)(4).

It is clear from Rule 216 that the burden lies on the parties to seek such relief when deemed necessary. In *Wilson v. Highway Service Marineland*, 418 A.2d

---

[4] According to the Reproduced Record, the Emergency Petition was served via email on Friday, June 6, 2025, in addition to being overnighted to Appellants. (R.R. at 54a.)

10

462, 464 (Pa. Super. 1980),[5] the attorney for the defendant argued that the trial court erred in refusing to continue a trial on the basis of the poor physical condition of its counsel, who had recently been involved in a motorcycle accident. The record, however, disclosed that "beyond explaining to the court the reason for his poor physical condition and stating that he was in court only because no other attorneys from his office were available, [the defendant's] counsel never entered a formal request for a continuance." *Id.* The Superior Court concluded the trial court did not abuse its discretion by not continuing the trial given that no request for a continuance was made.

Here, as in *Wilson*, Appellants did not ask for a continuance. In fact, they candidly concede that no request for a continuance was made. (Appellants' Br. at 11) ("While Appellants' former counsel did not expressly request a continuance, from the totality of the circumstances involved, it was clear that Appellants would not receive a fair hearing without an opportunity for their experts to testify."). This concession is consistent with the trial record. At the hearing, Appellants' then-counsel stated "[i]n this case it happened only last Tuesday. My client received notice on Saturday for a hearing today and has been able to get one expert report, a second expert report, but can't get his experts to testify on short notice." (R.R. at 86a.) There was no other discussion or request to continue.[6] As in *Wilson*, beyond explaining to the court the

---

[5] This Court is "not bound by the Superior Court's precedents although, where persuasive, [this Court is] free to adopt the Superior Court's reasoning." *Taylor v. Pennsylvania State Police*, 132 A.3d 590, 603 n.15 (Pa. Cmwlth. 2016) (quoting *Wertz v. Chapman Township*, 709 A.2d 428, 433 n.8 (Pa. Cmwlth. 1998), *aff'd*, 741 A.2d 1272 (Pa. 1999)).

[6] We also find it noteworthy that, despite Appellants' assertion that they were not permitted an adequate opportunity to present evidence regarding the safety of the structure, Appellants had that very opportunity when they presented both of their expert witnesses' testimony at the June 12, 2025 hearing on Appellant's Emergency Motion for Reconsideration. After considering the testimony presented by Appellants' experts, the trial court upheld its initial decision.

11

reason Appellants' experts were not available to appear at the hearing, Appellants' counsel never entered a formal request for a continuance. Accordingly, we cannot say as a matter of law that the trial court abused its discretion by not continuing the hearing.

Second, this Court has consistently held that the failure to request a continuance results in a waiver of any due process violation argument on appeal. *See Philadelphia Parking Authority v. Unemployment Compensation Board of Review*, 309 A.3d 1092 (Pa. Cmwlth. 2024) (holding that the employer could not argue on appeal that its procedural due process rights were violated where it failed to ask the trial court for a continuance when it realized the claimant was not at second hearing); *Commonwealth v. Kennedy*, 959 A.2d 916, 924-25 (Pa. 2008) (holding that counsel's failure to request a continuance waives the issue on appeal); *Strubinger v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 2025 C.D. 2008, filed May 15, 2009)[7] (holding that because the claimant failed to request a continuance of the hearing, he waived his right to pursue a due process argument on appeal); *Hickey v. Board of School Directors of Penn Manor School District*, 328 A.2d 549 (Pa. Cmwlth. 1974) (holding that a teacher waived his right to raise a denial of due process claim where he failed to request a continuance once he discovered that certain school employees did not appear at the school board's hearing). Here, because Appellants failed to request a continuance, they cannot now be heard to complain that they were denied due process. They have waived that issue.

---

[7] This Court's unreported memorandum opinions filed after January 15, 2008, may be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). The unreported cases cited herein are cited for their persuasive value.

## 2. *Whether Substantial Evidence Supported the Trial Court's Demolition Order*

In their second issue, Appellants assert that the trial court erred in ordering the demolition because no evidence was presented at the hearing that justified such an extreme remedy.

An order of demolition, such as that entered in the instant matter, is a taking pursuant to the police power, without compensation. As such, any order requiring confiscation and destruction of privately-held property must be subject to strict scrutiny and, in no instance, may such action be taken unless it is necessary for the protection of the public health, welfare, and safety. *King*, 552 A.2d at 744.

In *King*, this Court considered the question of whether the remedy of demolition was supported by the trial court's factual findings. After a hearing, the trial court entered an order directing the owners to demolish the building. *Id.* at 743. Ultimately, this Court concluded that the trial court's findings were insufficient where the owners had performed recent remedial work that the trial court did not consider and no specific factual finding was made that the structure "constituted a public danger, *i.e.*, was in imminent danger of collapse." *Id.* at 744. *See also City of Philadelphia v. Lindley Tower Realty Co., L.P.*, 327 A.3d 328, 338 (Pa. Cmwlth. 2024) (holding that the evidence in the record did not constitute substantial evidence to support the trial court's determination that the building's structure had deteriorated to the point where it was in imminent danger of collapse where experts were not structural engineers and no interior inspections were made).

However, where the trial court makes specific findings that a structure is unsafe and in imminent danger of collapse, which are supported by substantial evidence and competent expert opinion, we will conclude that the trial court properly authorized its demolition.

13

In *City of Philadelphia v. Urban Market Development, Inc.*, 48 A.3d 520 (Pa. Cmwlth. 2012), this Court affirmed the trial court's demolition order relying on a violation notice that specified that "the floor/ceiling assembly, a wall, and the roof of the [p]roperty were all deteriorated and in danger of collapse," as well as testimony from a code inspector that "there was no interior floor system, the roof was compromised, and the [p]roperty was in extremely dangerous condition and represented significant danger to the public." *Id.* at 523, 524.

In *City of Erie v. Stelmack*, 780 A.2d 824 (Pa. Cmwlth. 2001), this Court upheld a demolition order against a substantial evidence challenge. There, the city's fire code inspector testified specifically as to the fire code violations in the subject property, stating that the property was "in an unsafe condition from a fire perspective[.]" *Id.* at 828.

In *City of Pittsburgh v. Kronzek*, 280 A.2d 488, 492 (Pa. Cmwlth. 1971), the Director of the Pittsburgh Department of Public Safety issued notices of condemnation for six deteriorating and dilapidated rental buildings. The dangerous condition of one of the vacant buildings at issue was described as:

> [f]oundation out of plumb, stone disintegrated in foundation; roof and rafters sagging. Front wall out of plumb; rear wall bulged, brick deteriorated. Lintels and doors broken; gutters rotted; window frames and sash rotted; downspouts rusted out. Building in a generally dilapidated condition; unfit and unsafe for occupancy, constituting a serious hazard in the immediate area and a danger to the general welfare of the public.

*Id.* at 490, n.3. The trial court found that the City had acted properly within its constitutionally delegated police powers in issuing the demolition notices. We concluded that there was sufficient evidence in the record to support the trial court's order, namely, the visual observations and measurements of the City's building

14

inspector, photographs, personal familiarity with the property, and his knowledge of proper building safety standards. *Id.* at 490, n.3, 492.

In *Estate of Blose ex rel. Blose v. Borough of Punxsutawney*, 889 A.2d 653 (Pa. Cmwlth. 2005), we held that the trial court did not commit an error of law in finding that the borough's demolition of the owner's property was justified. Specifically, we upheld demolition where witnesses testified about the "deterioration of the building," and "[i]n general, . . . that the walls were leaning and bricks were falling from the building," and that these conditions persisted for more than one year. *Id.* at 655. Accordingly, we reasoned that the exterior of the building created "an immediate danger." *Id.*

In the instant matter, sufficient evidence was presented to demonstrate that the underlying conditions did exist such that the exercise of police power was reasonable and proper. At the June 10, 2025 hearing, Ms. Branthoover, a structural engineer, testified that she observed specific conditions that illustrated the at-risk nature of the building and its susceptibility to collapse. Specifically, Ms. Branthoover inspected the structure from the inside and outside. She supported her opinion with many photographs of what she described as structural failures. She identified a beam in the front façade being out of plumb, and that the wood that is still there is resting on the flange of the beam, which cannot support the load. (R.R. at 92a.) Ms. Branthoover further identified the openings in the roof that led to water damage that led to the failure of the entire first and second floors. *Id.* at 92a-93a. She described that the second-floor framing was significantly bent outward and exhibited extensive timber deterioration. *Id.* at 95a. She further testified that due to being open to the elements the foundation has begun to crack and would lead to further collapse. *Id.* at 94a. These opinions by a qualified structural expert were predicated on an inspection and review

15

of the property. In addition, the Building Inspector, after viewing the structure from the inside and outside, opined that the building was at imminent risk of collapse. Accordingly, we find that the photographs, reports, and expert testimony presented were ample enough to demonstrate the dangerous condition requiring the grant of the Emergency Petition.

As to whether demolition was the appropriate remedy here, Appellants point out that Mr. Kolodziej testified as to his belief that the building was not in imminent danger of collapse and could be salvaged. Mr. Kolodziej, however, provided no details about how he would bring the property into compliance, but argued only that he was not given that opportunity. Moreover, the Borough's witnesses, whom the trial court credited, opined to the contrary, that the building was beyond repair. *Id.* at 51a. Ms. Branthoover opined that even if Appellants were to complete the recommendations put forth by Appellants' engineer, the structure would still be in imminent danger of collapse. (R.R. at 96a-97a.) Thus, abatement of the issues identified would not be a viable option to remove the danger of collapse. As fact-finder, the trial court maintains exclusive province over matters involving the credibility of witnesses and the weight afforded to the evidence. *Parkview Court Associates v. Delaware County Board of Assessment Appeals*, 959 A.2d 515 (Pa. Cmwlth. 2008). Accordingly, the trial court did not err in ordering the demolition of a compromised building, when it found that no practical alternative existed to remediate the danger to the public.[8]

---

[8] Appellants also make a brief argument that the trial court erred by finding the property was a public nuisance. A public nuisance is "an unreasonable interference with a right common to the general public." *Diess v. Department of Transportation*, 935 A.2d 895, 912 (Pa. Cmwlth. 2007). An unreasonable interference includes "a significant interference with the . . . public safety . . . or . . . conduct [that] is proscribed by a statute, ordinance or administrative regulation." *Id.* As noted, the trial court accepted the evidence of partial collapse and deteriorated state of the subject building to determine there was a danger to residents. This same evidence was sufficient to support the trial court's conclusion that the building was a public nuisance.

### 3. *Testimony and Report of Ms. Branthoover*

In their last issue, Appellants argue that the trial court erred in admitting the testimony and Engineering Report of Ms. Branthoover, because she only possessed a cursory knowledge of the building gleaned from a "brief viewing." (Appellants' Br. at 17.) Appellants contend that Ms. Branthoover only spent approximately ten minutes on the property on June 3, 2025. They argue this was not enough time for her to determine that the entire structure was unsafe, and that additional testing and inspection was required. They also suggest that Ms. Branthoover "simply walked into the building in question, observed the first floor from the entrance, and concluded immediately, without further testing that the structure should be demolished." (Appellants' Br. at 19.) Relying on *A Kensington Joint*, 301 A.3d at 1003-04, they argue that "an interior inspection of a building posing a safety risk is typically required, as an exterior inspection would not uncover structural problems with the building." (Appellants' Br. at 19.)

Under Pennsylvania Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Pa.R.E. 703. "Traditionally, the opinion testimony of an expert must be narrowly limited to evidence of which he has personal knowledge, which is uncontradicted on the record or which is proffered on an assumed state of facts reasonably shown by the record." *Kozak v. Struth*, 531 A.2d 420, 422 (Pa. 1987).

Here, Ms. Branthoover testified that she observed specific conditions that illustrated the at-risk nature of the building and its susceptibility to collapse. She offered numerous photographs which clearly showed many areas inside of the building, and one of those photographs depicted her in the interior of the structure. Thus, Appellants' assertions that she did not conduct an interior inspection are belied by the

17

record, and disregards the evidence found credible by the trial court. Ms. Branthoover specifically identifies a beam in the front façade being out of plumb and being deteriorated that ultimately led to the collapse and would have led to further collapse. She further identified the openings in the roof that led to water damage that led to the failure of the first and second floors. She also testified that due to being open to the elements the foundation has begun to crack and would lead to further collapse. Moreover, on redirect examination, Ms. Branthoover confirmed that she was able to see everything she needed to see to come to her opinion and that there was nothing else she would have liked to do with any additional time. (R.R. at 108a.) She also explained that she conducts these types of inspections in her everyday practice of her work for the Borough, and she completes these inspections multiple times a week. *Id.*

Based on the above, we conclude that Ms. Branthoover's opinions were not speculative or insufficient to conclude that the building was required to be demolished and Appellants' argument to the contrary merits no relief.

Accordingly, the order of the trial court is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Elizabeth Borough                         :
                                          :
                v.                        :   No. 871 C.D. 2025
Kenneth A. Kolodziej and                  :
Lori A. Kolodziej,                        :
                Appellants                :

## *__ORDER__*

AND NOW, this 2nd day of April, 2026, the June 10, 2025 order of the Court of Common Pleas of Allegheny County, granting the Petition for Emergency Demolition filed by Elizabeth Borough is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge